**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

GARY WHITBY AND JEREMY
PAQUETTE,

                Plaintiffs,

    v.

CERNER CORPORATION,


                Defendant.

Case No. 2:25-cv-04087-BP

JURY TRIAL DEMANDED

---

**FIRST AMENDED CLASS ACTION COMPLAINT**

---

       Plaintiffs Gary Whitby and Jeremy Paquette, on behalf of themselves and all others similarly situated patients (collectively "Plaintiffs"), upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Defendant Cerner Corporation ("Cerner"), state as follows:

**NATURE OF THE ACTION**

       1.     Plaintiffs bring this action against Defendant Cerner for divulging their Health Information[1] to Google via Google's marketing systems, known as Google Analytics, Google Ads, and Google Display Ads, when patients exchanged communications with their healthcare providers via

---

[1] "Health Information" has the same meaning as defined by the Federal Trade Commission and as protected under the Health Information Portability and Accountability Act ("HIPAA").

1

Patient Portals provided by Cerner (the "Patient Portals"). Worse, Cerner did so without patients' knowledge, authorization, or consent.

2.      Cerner is one of the largest providers of health information technology services in the United States. Cerner hosts online Patient Portals for healthcare providers across the country, which allow patients to manage their healthcare online by, *e.g.*, viewing medical records, scheduling appointments, and messaging members of their care team.

3.      As a Patient Portal provider, Cerner operates as a "business associate" under HIPAA, which requires Cerner to maintain patients' Health Information in a manner consistent with HIPAA regulations.[2] In addition to HIPAA, Cerner is obligated to maintain the confidentiality of Health Information under state and federal law and Cerner's own promises to patients.

4.      Despite these obligations, and unbeknownst to patients, Cerner deployed various Google digital marketing and automatic rerouting tools on its Patient Portals. Via these tools, Cerner purposefully and intentionally disclosed patients' Health Information to third parties who exploited the information and used it for advertising. By using these tools, Cerner took patients' confidential communications and Health Information and automatically sent them to Google—a clear violation of patients' reasonable expectations of privacy, their rights as patients, and their rights under federal and state law.

5.      Cerner's conduct violates reasonable expectations of patient privacy. As a Patient Portal provider, Cerner promised patients that it was "committed to protecting [patients'] privacy and the security of the information [patients] entrust with us." Cerner did not provide patients with any warnings that using its Patient Portals would result in Cerner depositing Google cookies on patients'

---

[2] Cerner Corporation, *HIPAA Overview*, https://ulearn.cerner.com/content/cerner/courses/crs_186222501/Content_201105200905293727923831.pdf (last accessed November 25, 2024) ("The majority of the services Cerner performs for our clients puts us in the category of a business associate.").

personal computing devices or divulging their Health Information and the substance of their communications with healthcare providers to Google and its advertising systems.

6. There is no dispute that Cerner's conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin ("the Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[3] HHS expressly stated that "[t]racking on user-authenticated webpages … such as a patient or health plan beneficiary portal" must comply with the HIPAA privacy rule and all information relating to such use by patients must be "protected and secured in accordance with the HIPAA Security Rule."[4] HHS further clarified that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[5]

---

[3] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[4] *Id.*
[5] *Id.*

7.    Similarly, Google warns entities like Cerner who provide password protected patient portals that Google Analytics should not be deployed on "authenticated" pages:[2]



### Can Google Analytics be used in compliance with HIPAA?

Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.

For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin ☑ provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:

- Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.

- Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.

- Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..

- Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

8.    Despite patients' reasonable expectations that Cerner would not share their Health Information with Google via the use of marketing tools, Cerner routinely divulged patients' information anyway.

9.    Cerner did so through a multi-step process.

    a.    *First*, Cerner required patients to have first-party cookies enabled to access its "secure" Patient Portals. This requirement is a general security and usability standard for "authenticated" websites. First-party cookies are typically used to confirm that the user is who they say they are when they sign-in – and to keep them signed-in as they exchange

communications within "authenticated" portions of a website.

b.  *Second*, Cerner placed, enabled, or permitted the placement of Google source code on its Patient Portals and inside the patient portal mobile application that it made available to the public.

c.  *Third*, when a patient visited Cerner's Patient Portals or clicked to login to a Patient Portal, the Google source code that Cerner deployed enabled Google cookies to be placed on a patient's communications device that were disguised as "first-party" cookies belonging to Cerner or the healthcare provider. By disguising the Google cookies, Cerner prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Cerner required the use of first-party cookies to access the portal, Cerner assured that all patients who enter its Patient Portals would have the Google cookies placed on their device.

d.  *Fourth,* the Google source code that Cerner deployed in its Patient Portals commanded the patient's computing device to re-direct and divulge patient and device identifiers and the content of patient communications to Google via its various marketing services.

e.  *Fifth,* both Cerner and Google used this information for marketing purposes.

10.  Cerner did not make any attempt to obtain patient consent for sharing patients' protected Health Information with Google nor does Cerner have express written consent from any patient to share their Health Information with Google.

11.  Cerner's unauthorized disclosures violatde both state and federal law. Moreover,

through its unauthorized disclosures, Cerner breached its fiduciary duties, was unjustly enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act. As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist").

12.     Cerner's conduct caused damage to Plaintiffs and Class members in that:

a.     Sensitive and confidential information that Plaintiffs intended to remain private is no longer private;

b.     Cerner eroded the essential confidential nature of the provider-patient relationship;

c.     Cerner took something of value (i.e. personal data), from Plaintiffs and the Class and derived benefit therefrom without Plaintiffs' or the Class's knowledge, informed consent, or authorization and without sharing the benefit of such value; and

d.     Cerner's actions diminished the value of Plaintiffs' and the Class's personal information.

## PARTIES TO THE ACTION

13.     Plaintiff Whitby is a resident of Columbia, Missouri, and a patient of University of Missouri Health Care. Whitby has been a registered user of the HEALTHConnect Patient Portal operated by Cerner since 2015 and has used it regularly since that time until learning of, and being subject to, Cerner's practices as alleged herein.

14.     Plaintiff Paquette is a resident of Durango, Colorado and a patient of Memorial

Hermann Hospital, in Houston, Texas. Paquette has been a registered user of the Portal operated by Cerner since 2020.

15.     Defendant Cerner Corporation is incorporated under the laws of the State of Delaware, with a principal place of business at 2800 Rockcreek Parkway, North Kansas City, Missouri. Cerner supplies health information technology services and operates Patient Portals and was acquired by Oracle Corporation in June 2022.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, specifically, the Electronic Communications Privacy Act ("ECPA").

17.     This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

18.     This Court has personal jurisdiction over Cerner because Cerner has sufficient minimum contacts with this District in that it operates and markets its services throughout this District.

19.     Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

**A.     Cerner Routinely Disclosed the Protected Health Information of Patients to Third Parties including Google.**

20.     Plaintiffs are patients who have used password-protected Cerner Patient Portals.

21.     As Cerner recognizes, healthcare providers and their business associates have a duty to refrain from making unauthorized disclosures to third parties about their patients' Health Information.

22.     Medical patients like Plaintiffs and the Class have legal interests in preserving the confidentiality of their communications with healthcare providers.

23.     Patients also have reasonable expectations of privacy that their Health Information and communications will not be disclosed to third parties without their express written consent and authorization.

24.     Cerner has fiduciary, common law, and statutory duties to protect the confidentiality of Health Information and communications.

25.     Cerner expressly and impliedly promised patients that it would maintain and protect the confidentiality of patient Health Information and communications.

26.     Cerner operates Patient Portals for more than 100 hospitals and health care systems across the United States, including Memorial Herman in Texas and the University of Missouri in Missouri.

27.     Cerner encourages patients to use digital tools on its Patient Portals to seek and receive health care services.

28.     Cerner's Patient Portals are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, reviewing medical records and lab results, exchanging communications with providers, and renewing prescriptions. Source code on Defendant's Patient Portals causes these communications to be intercepted and disclosed to Google.

29.     Notwithstanding patients' reasonable expectations of privacy, Cerner's legal duties of confidentiality, and Cerner's express promises to the contrary, Cerner discloses the contents of patients' communications and Health Information via automatic data collection mechanisms embedded in the

portals operated by Cerner without patients' knowledge, authorization, or consent. In doing so, Cerner systematically violated the medical privacy rights of patients by causing the unauthorized disclosure of patient communications to be transmitted to third-party marketing companies like Google.

30. Plaintiffs and Class Members provided their private information to Cerner's Portal with the reasonable understanding that Cerner would secure and preserve the confidentiality of that information.

31. The Health Information of Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties utilizing the information for retargeting.

32. While Cerner intentionally incorporated tracking mechanisms into its Portal, Cerner never disclosed to Plaintiffs or Class Members that it shared their Health Information with Google and other third parties. Nor did Cerner inform patients that it was permitting Google to exploit their Information for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their Health Information was being surreptitiously transmitted to Google when they visited Cerner's Patient Portal.

33. The tracking mechanisms that Cerner uses on its Patient Portals are—by design—invisible to patients.

34. Cerner did not warn or otherwise disclose to Plaintiffs and Class Members that Cerner bartered their Health Information to Google and other third parties for marketing purposes.

35. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Cerner to disclose their Health Information with advertising companies like Google, particularly not beyond the limits of Cerner's express promises to protect the confidentiality of Plaintiffs' and Class Members' Information.

36. Upon information and belief, Cerner intercepted and disclosed the following Health Information to third parties including Google:

9

a.       Plaintiffs' and Class Members' status as patients;

b.       Plaintiffs' and Class Members' use of Cerner's Patient Portals;

c.       Plaintiffs' and Class Members' requests for and receipt of medical treatment, including their review of lab and test results, medications, appointments, and communications with their treating physicians.

37.     Cerner interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including the Google Analytics) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' Health Information to Google and other third parties.

38.     Cerner also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their Health Information to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Portals were safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' Health Information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' Health Information to third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Cerner was routinely bartering their Health Information to Google, and (6) otherwise ignoring Cerner's common and statutory obligations to protect the confidentiality of patient's Health Information.

39.     Plaintiffs and Class Members have suffered injury because of Cerner's conduct. Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

40.     Cerner's Patient Portals are in use at more than 100 hospitals around the United States.

41.     The Patient Portals provide patients and providers:

a.       the ability to send and receive electronic communications;

b.       computer storage of electronic health record and communications

10

information; and

    c.       processing services for electronic information.

42.      Cerner publicizes its ability to maintain customer data securely in its services that provide the ability to exchange communications, store electronic health record and communications information, and process such information for patients and providers.[6]

> **Secure healthcare data**
>
> Unfortunately, we know that retail, finance, and health data are the most targeted in security breaches. Patient privacy and the security of health data, when left unaddressed, threaten what the information of health exchange is solely meant to protect: patient safety. It's time to raise health data security to an unprecedented level of investment and focus.
>
> …We'll continue to apply the same security-obsessed focus to healthcare as we do to all industries, allowing people, patients, providers, and payors to safely access insights that improve care and advance decision-making.

43.      When a patient goes to a Cerner Patient Portal to "Sign In," Google Source Code that Cerner placed or permitted to be placed on its Patient Portals will deposit "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Cerner, which will permit them to be placed on the patient's device. In fact, however, these are Google cookies, not Cerner cookies.

44.      By disguising the Google cookies as belonging to Cerner instead of Google, Cerner is able to hack its way around attempts to block such tracking.

45.      Further, Cerner requires patients to have first-party cookies enabled to access its Patient Portals, which further assures that Cerner will be able to deposit the Google cookies on patient computing devices while patients are on and inside Patient Portals.

46.      Cerner's software permitted the deployment of "custom analytics scripts" within the

---

[6] ORACLE, *Oracle's Acquisition of Cerner: The Future of Healtchare*, https://www.oracle.com/health/acquisition-of-cerner-the-future-of-healthcare/

Patient Portals including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content are divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within Cerner's Patient Portals.

47. Cerner knowingly and secretly deployed Google source code on Patient Portal login pages and inside its Patient Portals. Cerner also encouraged its healthcare clients to deploy Google Analytics within their password protected patient portals.

48. The Google source code that Cerner deployed on its Patient Portals deposited Google cookies on patients' browsers; disguised several Google cookies as being associated with Cerner rather than Google; and commanded Plaintiffs' browsers to re-direct identifiers and communications content on and inside the Patient Portals to Google.

49. Cerner deployed source code that redirecting the following identifiers to Google:

    a.    Patient IP addresses;

    b.    Unique, persistent patient cookie identifiers;

    c.    Device identifiers;

    d.    Account numbers;

    e.    URLs;

    f.    Other unique identifying numbers, characteristics, or codes; and

    g.    Browser-fingerprints.

50. Cerner deployed source code that redirected the following communications content to Google on and inside its Patient Portals:

    a.    Actions to log-in to Patient Portals;

    b.    Actions to Sign Up for Patient Portals;

    c.    Actions to log-out of Patient Portals;

        d.      Actions taken inside Patient Portals;

        e.      Any actions that patients take on their healthcare providers' properties while logged-in to Patient Portals, including searching or exchanging communications about a specific doctor, condition, or treatment.

51.      The amount of data collected is significant. When patients interacted with its Patient Portals, Cerner disclosed a full-string, detailed URL to Google, which contains the name of the website, folder and sub-folders on the webserver, the name of the precise file requested, and the exact contents of the patients' communications. For example, when a patient clicks on a link to view a specific test result or make an appointment with a specific physician, Google receives the precise text of the patients' query.

52.      Cerner similarly deployed Google Analytics technology within the mobile application that it makes available to the public. Via this technology, Cerner similarly shared details regarding patients health information every time they accessed the Cerner patient portal via the Cerner mobile application, including information such as logins, page views, notifications, IP addresses, and device data, which allowed Google to specifically identify the patients using the Cerner mobile application.

53.      As a result of these disclosures, Google receives the precise text of communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, tests, medications, payments, and registrations.

54.      The contents of patients' communications with their treating physicians plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Cerner's Portal. Worse, no matter how sensitive the area of the portal site that a patient reviewed, the referral URL was acquired by Google along with other Health Information.

55.      The nature of the collected data is also important. Cerner's unauthorized disclosures resulted in Google obtaining a comprehensive history of an individual patient, no matter how sensitive

the patient's medical condition. Google was then able to correlate that history with the time of day and other user actions. This process resulted in Google acquiring a vast repository of personal data about patients—all without their knowledge or consent.

56.     These transmissions occurred without patients' knowledge, consent, authorization, or any further action by patients.

57.     By design, Google received the exact contents of patients' communications while they are in storage in Cerner's systems but before the full response from the healthcare providers to Plaintiffs has been rendered on the screen of Plaintiffs' device.

58.     These transmissions to Google were not necessary for Cerner's Portals or services to function. Instead, they allow Cerner and Google to utilize patient health information and communications for marketing purposes.

59.     For example, Plaintiff Whitby has used the Cerner-hosted HEALTHConnect portal since approximately 2012 in connection with healthcare provided at University of Missouri Health Care. Whitby has sought treatment from University of Missouri Health Care for a number of medical conditions, including head and neck cancer. He has used the HEALTHConnect portal to confirm appointments, check for his annual physical test results, follow-up on these results, and send notes to his doctor regarding prescriptions. When using the Cerner patient portal, he has entered data inside the patient portal related to his head and neck cancer that was shared with Google via the analytics technologies that Cerner deployed inside its patient portal.

60.     Likewise, Plaintiff Paquette also used a Cerner-hosted patient portal, Everyday Well, in connection with healthcare provided at Memorial Hermann Health System in Houston, Texas. In 2020, Paquette sought treatment from Memorial Hermann Health System in connection with a mountain biking accident and resulting neck injury, for which he received both surgical and post-surgical care. For example, from October 2020 through April 2021, Paquette regularly logged into

the Everyday Well portal and used it to contact his healthcare provider, request access to medical records, review scans and other test results, communicate with surgical and non-surgical physicians, and pay bills for his treatment related to his bike accident and resulting neck injury.

**B.      What Happens When Patients Communicate with Cerner's Patient Portals**

61.      When patients logged-in to Cerner's Patient Portals either through a website or via the Cerner mobile application, Cerner re-directed the precise content of the patients' communication and patients' identifiers to Google at various Google domains.

62.      When patients signed-in or exchanged communications inside the portal, Cerner immediately placed the content of that communication in storage within the Patient Portals.

63.      Cerner's immediate storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

64.      After Cerner has stored the content of the communication, but while the Patient Portal exchange with patients was still occurring, Cerner re-directed patients' information to the following Google domains:

a.      www.google-analytics.com

b.      www.google.com

c.      www.doubleclick.net

**Re-directed Patient Identifiers to www.google-analytics.com**

65.      The patient identifiers that were re-directed to Google-Analytics include:

a.      The patient's IP address;

b.      The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

c.      Google cookies disguised as Cerner's cookies which serve as device identifiers and that Google connects to patients. These cookies include but

may not be limited to the _ga and _gid cookies.

**Re-directed Patient Identifiers to www.google.com**

66. The patient identifiers that were re-directed to www.google.com included:

   a. The patient's IP address;

   b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

   c. Google cookies that uniquely identify the patient's device or, in the case of Google Account holders, their specific Google Account. The cookie that identifies that patient's device on Google.com is called NID. The cookies that identify the patient's specific Google Account are generally named in way that begins with the word Secure.

67. Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes protected health information protected by federal law.

**Re-directed Patient Identifiers to www.doubleclick.net**

68. The patient identifiers that Cerner directed to www.doubleclick.net include:

   a. The patients' IP addresses;'

   b. The patients' User-Agent information and other data that, when combined, is sufficient to uniquely identify the device;

   c. Google cookies that uniquely identify the patients' devices or, in the case of Google Account holders, their specific Google Accounts. The cookie that identifies that patients' devices on Google.com is called IDE. The cookie that identifies the patients' specific Google Account is 'DSID.'

16

69.     Similar to re-directions to Google.com, Google will always receive at least the device-identifying IDE cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the IDE cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes protected health information protected by federal law.

70.     Further if a Google Account holder has signed-in to a Google Account on the device in question and did not formally sign out before sending a separate communication to the Patient Portals, then Cerner will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Cerner enables Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

**Google Properties to Which Cerner Redirects Patient Data**

71.     For Google Analytics, Cerner re-directed patient identifiers and communications content to www.google-analytics.com/collect.

72.     For Google.com, Cerner re-directed patient identifiers and communications content to properties that include but may not be limited to:

        a.      www.google.com/ad/ga-audiences; and

        b.      adservice.google.com

73.     The Google property www.google.com/ad/ga-audiences is typically used to build "Custom Audiences" for purposes of "remarketing" or "retargeting" ads. This technology works by putting any person who takes a specific action within a "user list." The advertiser can use the user-list to engage in positive or negative retargeting. In the case of Cerner, positive remarketing would involve sending specific ads to patients who had taken specific actions. For example, if a healthcare provider

sought to increase utilization of a specific type of service, it could positively target all patients who had gone to a specific page. Negative retargeting is the opposite. For example, if a healthcare provider was seeking new patients, it could target its advertising campaign to exclude existing patients, *i.e.* any person who had logged-in to its Patient Portal.

74.    For Doubleclick.net, Cerner re-directed patient identifiers and communications content to properties that include but may not be limited to:

      a.    Stats.g.doubleclick.net; and

      b.    8166114.fls.doubleclick.net.

**C.    Cerner's Actions Permit Google to Connect Patients' Data Across Domains**

75.    Google publicly states that it connects data that advertisers and publishers (like Cerner here) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

76.    Cerner usds the same tools and source code throughout Patient Portals. Thus, the types of Google cookies deposited on patient devices and the types of health information and communications content explained above occurred every time a patient logged into or took any action within the Patient Portals.

**D.    Google's Business Model: Exploiting Consumers' Personal Information for Profit**

77.    By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective category, including the advertising services of Google DoubleClick and Google AdWords.

78.    Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged

in."[7]

79.     Google cookies provide personally identifiable data about patients who visit Cerner's

Patient Portals to Google.  Cerner transmits personally identifiable Google cookie data to Google.

80.     Google specifically warns developers and advertisers that Google Analytics is not

appropriate for HIPAA-covered entities like Cerner, publicly stating:[8]

> Customers must refrain from using Google Analytics in any way that may create
> obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics
> must refrain from exposing to Google any data that may be considered Protected Health
> Information (PHI), even if not expressly described as PII in Google's contracts and
> policies. Google makes no representations that Google Analytics satisfies HIPAA
> requirements and does not offer Business Associate Agreements in connection with this
> service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics
> on their properties, the HHS bulletin provides specific guidance on when data may and
> may not qualify as PHI. Here are some additional steps you should take to ensure your
> use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any
>   way that implicates Google's access to, or collection of, PHI, and may only
>   use Google Analytics on pages that are not HIPAA- covered.
>
> - Authenticated pages are likely to be HIPAA-covered and customers should
>   not set Google Analytics tags on those pages.
>
> - Unauthenticated pages that are related to the provision of health care services,
>   including as described in the HHS bulletin, are more likely to be HIPAA-
>   covered, and customers should not set Google Analytics tags on HIPAA-
>   covered pages.
>
> - Please work with your legal team to identify pages on your site that do not
>   relate to the provision of health care services, so that your configuration of
>   Google Analytics does not result in the collection of PHI.

81.     Google tracks Internet users with IP addresses, cookies, geolocation, and other unique

device identifiers.

---

[7] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data- than-facebook-try-google-1524398401).

[8] Google, *HIPAA and Google Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

82.     Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a.     "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[9]

b.     "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[10]

c.     "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[11]

d.     "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google properties, like YouTube, may also use these cookies to show you more

---

[9] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https://policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).
[10] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https://policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[11] Id.

relevant ads."[12]

83.     Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

84.     Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[13]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in- market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

> ❌ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

85.     The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[14]

86.     Google refuses to sign business associate agreements ("BAA") with healthcare companies.

---

[12] Id.

[13] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

[14] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**E.    Cerner Shared a Trove of Personally Identifiable Information with Google.**

### IP Addresses Are Personally Identifiable

87.    An IP address is a number that identifies a computer connected to the Internet.

88.    IP addresses are used to identify and route communications on the Internet.

89.    IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. advertising using IP addresses.

90.    Under HIPAA, an IP address is considered personally identifiable information. See 45 C.F.R. § 164.514(b)(2)(i)(O).

91.    Whenever a patient logs into or uses Cerner's Patient Portals, Cerner uses and causes the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

### Internet Cookies Are Personally Identifiable

92.    In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

93.    Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

94.    Cookies are designed to and, in fact, most often do operate as means of

identification for Internet users.

95.     Cookies are protected personal identifiers under HIPAA. See 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

96.     In general, cookies are categorized by duration and party.

97.     There are two types of cookies classified by duration:

   a.     "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

   b.     "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

98.     Cookies are also classified by the party that uses the collected data:

   a.     "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

   b.     "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits a Cerner Patient Portal will also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically

helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

99.     Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to that person's communications and habits. To build individual profiles of Internet users, third-party data companies assign each user a unique, or a set of unique identifiers to each user.

100.     Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Cerner can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The reverse is also true: Google was not provided direct access to the values associated with first- party cookies set by Cerner.

101.     Google has designed a way to hack around the same-origin policy so that third-party data companies gain access to first-party cookies – and Cerner has adopted it.

102.     Javascript source code developed by third-party data companies and placed on a webpage by developers such as Cerner can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

103.     Whenever a patient uses Cerner's Patient Portals, Cerner uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein,

including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Patient Portals.

104.     Cerner's cookie disclosures include the deployment of cookie synching techniques through which Cerner deposits Google cookies on patient computing devices by disguising the Google cookies as belonging to Cerner.

105.     Cerner then re-directs the disguised Google cookies to Google.

## Browser-Fingerprints Are Personally Identifiable

106.     Browser-fingerprints are information collected about a computing device that can be used to identify the device.

107.     Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

108.     The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[15]

109.     In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of users.[16]

---

[15] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[16] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

110. Browser-fingerprints are protected personal identifiers under HIPAA. See 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

111. Whenever patients use Cerner Patient Portals, Cerner uses and causes disclosures of data sufficient to form browser-fingerprints with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

112. Each of the individual data elements described above is personally identifiable on their own. However, Cerner's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

113. Cerner knowingly discloses information that allows Google and other advertisers to link patients' Health Information to their private identities and target them with advertising. Cerner intentionally shared the Health Information of patients with Google in order to gain access to the benefits of Google Analytics.

114. The information Plaintiffs and Class Members provide to Cerner via its Patient Portals website (and then shared illegally with Google) can be combined with other information in Google's possession, like their names, dates of birth, and phone numbers, to more effectively target patients with advertisements or sell patients' data to third parties.

115. Cerner knew that by embedding Google Analytics—a Google marketing tool—it was permitting Google to collect, use, and share Plaintiffs' and the Class Members' Health Information, including sensitive medical information and personally identifiable data. Cerner was also aware that such information would be shared with Google simultaneously with patients' interactions with its patient portals. Cerner made the decision to barter patients' Health Information to Google because it

wanted access to Google Analytics and related Google tools. While that bargain may have benefited Cerner and Google, it betrayed the rights of Plaintiffs and Class Members.

**F.**  **Plaintiffs' Personal Health Data that Cerner collected, disclosed, and exploited is Plaintiffs' property, has economic value, and its illicit disclosure caused Plaintiffs harm.**

116.  The value of data that companies like Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

117.  In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[17]

118.  In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[18] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[19]

119.  Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[20]

120.  Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on

---

[17] https://ig.ft.com/how-much-is-your-personal-data-worth/
[18] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[19] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[20] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

27

disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[21]

121. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[22] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[23]

122. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[24]

123. Cerner was compensated for its disclosures of Plaintiffs' and Class members' Health Information by the third-party recipients in the form of enhanced analytics and marketing services. Among other things, Cerner used the analytics data that it received from Google to enhance the patient portal product that it marketed and sold to health care systems. In turn Google, used the patient data it received from Cerner to sell advertising to other third parties, targeted to the patients whom Cerner was supposedly serving and protecting from privacy violations.

124. Cerner did not pay (or offer to pay) Plaintiffs and Class Members for their Health Information before Cerner shared this data with Google and other advertisers.

125. Cerner profited from Plaintiffs' and Class members' information without ever intending to compensate Plaintiffs and Class members or inform them that the disclosures had been

---

[21] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[22] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app
[23] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[24] https://www.creditdonkey.com/best-apps-data-collection.html; see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/

made.

126.    Cerner was unjustly enriched by its conduct.

**G.    Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Health Information.**

127.    As patients, Plaintiffs had a reasonable expectation of privacy that Cerner would not disclose their Health Information to third parties without their express authorization.

128.    As patients using Cerner's Patient Portals, Plaintiffs had a reasonable expectation of privacy that Cerner would not disclose their Health Information or the content of their communications to third parties without their express authorization.

129.    Plaintiffs' reasonable expectations of privacy in their Health Information and communications exchanged with Cerner are derived from multiple sources, including

a.    Cerner's status as Plaintiffs' healthcare Patient Portal provider;

b.    Cerner's common law obligations to maintain the confidentiality of Health Information and communications;

c.    State and federal laws and regulations protecting the confidentiality of Health Information;

d.    State and federal laws protecting the confidentiality of communications and computer data;

e.    State laws protecting unauthorized use of personal means of identification; and

f.    Cerner's express promises of confidentiality.

130.    It was reasonable for Plaintiffs and Class Members to assume that Cerner's privacy policies were consistent with Cerner's duties to protect the confidentiality of patients' Health Information.

131.    Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

29

132.    Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

133.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[25]

134.    Users act consistently with these preferences.  For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[26]

135.    "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

136.    The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable.  Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born.  As one recent article noted, "What is particularly worrying about this process of

---

[25] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[26] https://www.wired.co.uk/article/apple-ios14-facebook

datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[27]

137.    Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook.  As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**H.    Patients' health information is protected against unauthorized disclosure by both state and federal law.**

138.    The confidentiality of patients' Health Information is specifically protected by law.  *E.g.* Mo. Rev. Stat. § 491.060(5); Mo. Rev. Stat. § 407.1500.  The prohibitions against disclosing Health Information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes.  *E.g.* Mo. Rev. Stat. § 569.095; 45 C.F.R. § 164.514.  Both state and federal law also restrict the use of patients' Health Information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

139.    Cerner does not have a legal right to share Plaintiffs' and Class Members' Health Information without their written consent to third parties, because this information is protected from such disclosure by law.  C.F.R. § 164.508.  Nor is Cerner permitted to disclose patients' Health Information to advertising and marketing companies like Google without express written authorization from patients. 45 C.F.R. § 164.502(a)(5)(ii).

---

[27] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

140.    Indeed, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting Health Information via tracking technology like Google Analytics without a patient's authorization and other protections like a business associate agreement with the recipient of the Information. Among other things, the HHS warned hospitals like those for whom Cerner provides its Patients Portals, that "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[28]

141.    Cerner failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their Health Information and the contents of their communications for marketing purposes.

142.     Health Information is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

143.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[29]

144.    Business associates like Cerner also must also comply with the privacy obligations

---

[28] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html
[29] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

imposed by HIPAA.[30]

145.    The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103.

146.    In relevant part, PHI is defined as "individually identifiable health information . . . transmitted by electronic media [or] maintained in electronic media."

147.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

148.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if":(1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the method sand results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

    A. Names;
    . . .
    H. Medical records numbers;
    . . .
    J. Account numbers;

---

[30] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privay and Security Rules, like those described here, to business associates).

. . .
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
R. Any other unique identifying number, characteristics, or code…; and"
the covered entity must not "have actual knowledge that the information could be used
alone or in combination with other information to identify an individual who is a subject
of the information."

45 C.F.R. § 164.514.

149.    The HIPAA Privacy rule requires covered entities and business associates to maintain
appropriate safeguards to protect the privacy of protected health information and sets limits and
conditions on the uses and disclosures that may be made of protected health information without
authorization. 45 C.F.R. §§ 160.103, 164.502.

150.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in
violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health
identifier; [or] (2) obtains individually identifiable health information relating to an individual." The
statute states that a "person … shall be considered to have obtained or disclosed individually
identifiable health information in violation of [Part C] if the information is maintained by a covered
entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C.
§ 1320d-6.

151.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-
6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or
use individually identifiable health information for commercial advantage, personal gain, or malicious
harm." In such cases, the entity that knowingly obtains individually identifiable health information
relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years,
or both."

152.    Courts have recognized that patient status is protected by HIPAA. *In re Meta Pixel
Healthcare Lit.,* Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12, (N.D. Cal. Dec. 22, 2022) ("I agree

34

that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."), *Id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA").

153.    Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[31]

154.    In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[32]

155.    In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on Patient Portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform.

---

[31] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[32] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

**Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[33]

156.     The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement (or "BAA") before utilizing their services:

[T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[34]

157.     HHS reiterated that "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or

---

[33] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last reviewed June 26, 2024) (emphasis added).
[34] *Id.*

any other violations of HIPAA Rules."[35]

158.    As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

> For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[36]

## TOLLING, CONCEALMENT, AND ESTOPPEL

159.    The applicable statutes of limitation have been tolled because of Cerner's knowing and active concealment and denial of the facts alleged herein.

160.    Cerner seamlessly incorporated trackers into its Patient Portals, providing no indication to patients that they were being tracked for marketing purposes. Cerner had knowledge that its Patient Portals incorporated tracking technologies yet failed to disclose that by interacting with the Portals, Plaintiffs' and Class Members' Health Information would be intercepted, collected, used by, and disclosed to third parties.

161.    Plaintiffs and Class Members could not, with due diligence, discover the full scope of Cerner's conduct, because there were no disclosures or other indication that they were interacting with Patient Portals employing Google Analytics or other tracking technologies.

162.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. What's more, Cerner was under a duty to disclose the nature and significance of its data collection practices but did not do so.  Cerner is therefore estopped from relying on any statute of limitations defenses

---

[35] *Id.*
[36] *Id.*

## CLASS ACTION ALLEGATIONS

163.     Plaintiffs re-allege and incorporate by reference the allegations set forth above.

164.     Plaintiffs bring this action as a nationwide class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> All patients in the United States who logged into Patient Portals provided by Cerner where Google Analytics was deployed.

165.     Excluded from the Class are Cerner and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

166.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

167.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Cerner.

168.     **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class members. These common legal and factual questions include the following:

g.     Whether Cerner's practices relating to disclosures of Plaintiffs' and Class members' Health Information to third parties were intentional;

h.     Whether Cerner profited from disclosures to the third parties;

i.     Whether Cerner's conduct violates the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* and 18 U.S.C. § 2701, *et seq.*;

j.     Whether Cerner's practices constitute an unauthorized intrusion upon seclusion;

k.   Whether Cerner's practices constitute identity theft;

l.   Whether Cerner's practices constitute a breach of fiduciary duty;

m.   Whether Cerner's practices constitute tampering with computer data;

n.   Whether Cerner's practices constitute unjust enrichment;

o.   Whether placement of the Google cookies disguised as belonging to Cerner on patient computing devices is a highly offensive intrusion upon seclusion;

p.   Whether Cerner's conduct harmed and continues to harm Plaintiffs and Class members, and if so, the extent of the injury;

q.   Whether and to what extent Plaintiffs and Class members are entitled to damages and other monetary relief;

r.   Whether and to what extent Plaintiffs and Class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

s.   Whether and to what extent Plaintiffs and Class members are entitled to attorneys' fees and costs.

169.   **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have substantially the same interest in this matter as other Class members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of the other Class members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class members. Plaintiffs and all Class members are patients who used Cerner Patient Portals and are victims of Cerner's unauthorized disclosures to third parties. All Plaintiffs' and Class members' claims are based on Cerner's wrongful conduct and unauthorized disclosures.

170.   **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

171.   **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** –

Cerner acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

172.    **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Cerner. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

173.    Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Cerner;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability

to protect their interests; and/or

c.    Cerner has acted or refused to act on grounds generally applicable to the
Class, thereby making appropriate final and injunctive relief with respect to
the Class members as a whole.

## COUNT I

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
## 18 U.S.C. § 2511(1)
## Wiretap Interception

174.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the
foregoing paragraphs as if fully alleged herein.

175.    Title I of the ECPA, also known as the Wiretap Act, provides a private cause of action
against any person who intercepts an electronic communication.

176.    The Electronic Communications Privacy Act, 18 U.S.C. § 2510, protects individuals
against eavesdropping committed with an improper purpose.

177.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors
to intercept, or procures any other person to intercept or endeavor to intercept, any . . .  electronic
communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents
of any . . . electronic communication, knowing or having reason to know that the information was
obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally
uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason
to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic
communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

178.    Plaintiffs' communications via Patient Portals, including their communications with
their treating physicians, are covered communications under the Wiretap Act.

179.    The ECPA protects both the sending and receipt of electronic communications.

41

180.     The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

181.     "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

182.     The transmissions of data between Plaintiffs and Class members and their healthcare providers' Patient Portals, which are hosted by Cerner, qualify as communications under the ECPA.

183.     "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

184.     "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

185.     The "contents" of Plaintiffs' electronic communications included:

      a.     the parties to the communications;

      b.     the precise text of patient search queries;

      c.     personally identifiable information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

      d.     the precise text of patient communications about specific doctors;

      e.     the precise text of patient communications about specific medical conditions;

      f.     the precise text of patient communications about specific treatments;

      g.     the precise text of patient communications about scheduling appointments with medical providers;

      h.     the precise text of patient communications about billing and payment;

i.  the precise text of specific buttons on Cerner's portal that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, and other buttons;

j.  the precise dates and times when patients click to Log-In on Cerner's portal;

k.  the precise dates and times when patients visit Cerner's portal;

l.  information that is a general summary or informs third parties of the general subject of communications that Cerner sends back to patients in response to requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m.  any other content that Cerner has aided third parties in scraping from webpages or communication forms in its Patient Portals.

186. Plaintiffs' and Class Members' communications with Cerner constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a.  Plaintiffs and Class Members' personal computing devices;

b.  Plaintiffs and Class Members' web browsers;

c.  Plaintiffs and Class Members' browser-managed files;

d.  Google Analytics;

e.  Internet cookies;

f.  Cerner's computer servers; and

g.  Third-party source code used by Cerner;

187. Whenever Plaintiffs and Class members interacted with Cerner's Patient Portals, Cerner, through the source code they imbedded and ran on its Patient Portals, contemporaneously and intentionally intercepted and divulged the contents of Plaintiffs and Class members' electronic

43

communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

188.     Cerner acquired the content of patient communications while patients were still exchanging communications with their healthcare providers inside the Patient Portal.

189.     When a patient makes contact with a Cerner Patient Portal to exchange communications with their health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the Patient Portal server. The line remains open and communications continue to flow back-and-forth from the patient's communications device and Cerner's servers. The patient's communications with their healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Cerner's servers, Cerner has also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

190.     Cerner's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

    a.     Cookies, including the Google cookies disguised as Cerner's cookies;

    b.     Healthcare providers' web-servers;

    c.     Google's web-servers;

    d.     Cerner's web-servers; and

    e.     The Google source code described herein.

191.     The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

192.     Neither Cerner nor Google were parties to Plaintiffs' and Class members'

44

communications with their healthcare providers.

193.     But even if Cerner was a party to the communications, Cerner is still liable under the ECPA because it acted with purposes of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

    a.    A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data;

    b.    A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain;"

    c.    A knowing intrusion upon seclusion, including the unauthorized placement of Google cookies disguised as Cerner's cookies on patient computing devices; and

    d.    Trespass upon Plaintiffs' and patient Class members' personal and private property via the placement of the Google cookies disguised as Cerner's cookies.

194.     Cerner accessed, obtained, and disclosed Plaintiffs' and Class Members' Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the Information or the marketing services if it had complied with the law.

195.     Cerner acted without Plaintiffs' or Class members' consent.

196.     Cerner acted without the consent of Plaintiffs' or Class members' healthcare providers.

197.     Although Plaintiffs consented to Cerner acquiring their Information for purposes of providing medical care and access to their health records, Plaintiffs did not consent to Cerner acquiring

the Information for purposes of re-directing it to Google.

198.     As such, Defendant cannot viably claim any exception to ECPA liability.

199.     As a direct and proximate result of Cerner's violation of the ECPA, Plaintiffs and Class members were damaged by Cerner's conduct in that:

a.     Cerner harmed Plaintiffs' and Class members' interest in privacy;

b.     Sensitive and confidential information that Plaintiff and Class members intended to remain private is private no longer;

c.     Cerner eroded the essential confidential nature of the provider-patient relationship;

d.     Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e.     Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included their healthcare provider's duty to maintain confidentiality; and

f.     Cerner's actions diminished the value of Plaintiffs and Class members' personal information.

200.     In violating the ECPA, Cerner's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, and involved a recklessly negligent or callous indifference to patients' protected rights under both state and federal law.  Indeed, Cerner not only intentionally harmed patients without just cause but also acted with a deliberate and flagrant disregard for the safety and privacy of the patients who used its patient portals. Specifically:

a.     Cerner knew it had a duty to safeguard and keep confidential Plaintiffs' protected health information under HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.     Cerner knew that Plaintiffs reasonably expected their communications with their healthcare providers to remain private;

c.     Cerner knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.     Cerner knew it was prohibited by law from intercepting and disclosing Plaintiffs' communications;

e.     Cerner knew that Google used the patient data that it was receiving via Google Analytics for marketing purposes;

f.     Cerner knew that it was required to sign a business associate agreement with any tracking technology vendor with whom Cerner was sharing patient data;

g.     Cerner knew that its use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

h.     Cerner nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' Health Information without Plaintiffs' consent, in a knowing violation of the ECPA;

i.     Cerner carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private Health Information at Plaintiffs' expense and for Cerner's own financial gain; and

j.     Cerner's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' Health Information under the guise of offering

healthcare services to Plaintiffs.

201.    The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

202.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

### COUNT II

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(3)**
**Wiretap Divulgence by an ECS Provider**

203.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

204.    The Wiretap portion of the Electronic Communications Privacy Act provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such per or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient of such communication or an agent of such addressee or intended recipient."

205.    Google is not "an agent" of the patients, their healthcare providers, or any other covered entity.

206.    An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

207.    Cerner is an electronic communication service ("ECS") provider with respect to its Patient Portals.

208.     Cerner's ECS services are "to the public" because they are available to any member of the general public that fits the qualification of being a patient of a healthcare provider or any covered entity that uses Cerner's Patient Portals. Any member of the public may become a patient of a healthcare provider or any covered entity that uses Cerner's Patient Portals. These healthcare providers are, in fact, required to provide medical services to members of the public. 42 U.S.C. §1395dd.

209.     The ECPA also provides that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication—(i) as otherwise authorized in sections 2511(2)(a) or 2517 of this title; (ii) with the lawful consent of the originator or any addressee or intended recipient of such communication; (iii) to a person employed or authorized, or whose facilities are used, to forward such communication to its destination; or (iv) which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." 18 U.S.C. § 2511(3)(b).

210.     None of the exceptions apply to this case.

211.     Section 2511(2)(a) applies only to disclosures to officers, employees or agents of an ECS in the "normal course of employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service." Disclosures to Google do not apply to this exception.

212.     Section 2517 applies only to interceptions by investigative or law enforcement officers. Disclosures to Google do not apply to this exception.

213.     The exception for "lawful consent" does not apply because Cerner did not obtain the "lawful consent" of any originator, addressee, or intended recipient of Patient Portal communications.

214.     There was no consent obtained at all from patients.

215.     Any purported consent from a healthcare provider or any other covered entity to disclose communications content to Google relating to Cerner's Patient Portals was not "lawful consent" because it violates the covered entity's obligations under federal and Missouri law.

49

216.     Google is not "a person employed or authorized, or whose facilities are used, to forward such communication to its destination."

217.     The communications in question were not "inadvertently obtained," do not "appear to pertain to the commission of a crime," and Google is not "a law enforcement agency."

218.     The "content" divulged by Cerner includes the following information and precise text concerning the substance, purport, or meaning of underlying communications:

      a.     That Plaintiffs logged-in to Cerner's Patient Portals;

      b.     That Plaintiffs communicated with their healthcare providers in Cerner's Patient Portals;

      c.     That Plaintiffs requested appointments with their healthcare providers in Cerner's Patient Portals;

      d.     That Plaintiffs accessed medical records with their healthcare providers' in Cerner's Patient Portals;

      e.     That Plaintiffs accessed test results with their healthcare providers in Cerner's Patient Portals; and

      f.     That Plaintiffs sent and received searches and communications about specific doctors, conditions, and treatments while logged-in to Cerner's Patient Portals;

219.     Cerner divulges information regarding the substance, purport, and meaning of patients' communications while communications are still in transit between patients and their healthcare providers.

220.     As a direct and proximate result of Cerner's violation of the ECPA, Plaintiffs and Class members were damaged by Cerner's conduct in that:

      a.     Cerner harmed Plaintiffs' and Class members' interest in privacy;

b.      Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

c.      Cerner eroded the essential confidential nature of the provider-patient relationship;

d.      Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e.      Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included healthcare providers' duty to maintain confidentiality; and

f.      Cerner's actions diminished the value of Plaintiffs and Class members' personal information.

221.    In violating the ECPA, Cerner's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, and involved a recklessly negligent or callous indifference to patients' protected rights under both state and federal law. Indeed, Cerner not only intentionally harmed patients without just cause but also acted with a deliberate and flagrant disregard for the safety and privacy of the patients who used its patient portals. Specifically:

a.      Cerner knew it had a duty to safeguard and keep confidential Plaintiffs' protected health information under HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.      Cerner knew that Plaintiffs reasonably expected their communications with their healthcare providers to remain private;

c.      Cerner knew that Plaintiffs' communications involved private and

51

sensitive matters concerning Plaintiffs' healthcare;

d.      Cerner knew it were prohibited by law from disclosing Plaintiffs' communications;

e.      Cerner knew that their use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.      Cerner knew that divulging Plaintiffs' communications violated the ECPA based on previously filed litigation concerning the illegality of deploying tracking technology within Cerner patient portals, *see Doe, et al. v. MedStar*, Baltimore City Circuit Court Case No. 24-C-20-000591;

g.      Cerner nonetheless knowingly and deliberately divulged Plaintiffs' health communications to third-party advertisers without Plaintiffs' consent, in a knowing violation of the ECPA;

h.      Cerner carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Cerner's own financial gain; and

i.      Cerner's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' health communications under the guise of offering healthcare services to Plaintiffs.

222.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT III

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2702(a)(1)
### Divulgence of Stored Communications Content by an ECS Provider

223.     Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

224.     Title II, the Stored Communications Act portion of the Electronic Communications Privacy Act, provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

225.     Cerner is an ECS provider as set forth above.

226.     Cerner's services are provided "to the public" as set forth above.

227.     The contents at issue are the same as set forth above.

228.     "Electronic storage" means "(A) any temporary, intermediate storage of … a[n] electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an ECS for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

229.     When patients exchange communications in Cerner's Patient Portals, Cerner immediately places the contents of those communications in "temporary, intermediate storage" that is "incidental to the electronic transmission thereof," and "for purposes of backup protection of such communication."

230.     The "backup protection" storage is required as a matter of federal law for Cerner's Patient Portals.

231.     The divulgences to Google occur while the communications are in transit and in electronic storage.

232.    Cerner's divulgences occur while the communications are in "electronic storage."

233.    Exceptions to liability are provided in 18 U.S.C. § 2702(b), permitting a provider to "divulge the contents of a communication—(1) to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient; (2) as otherwise authorized in section 2517, 2511(2)(a), or 2703 of this title; (3) with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service; (4) to a person employed or authorized or whose facilities are used to forward such communication to its destination; (5) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service; (6) to the National Center for Missing and Exploited Children, in connection with a report submitted thereto under section 2258A; (7) to a law enforcement agency … (8) to a governmental entity [in certain

circumstances]; or (9) to a foreign government [in certain circumstances]."

234.    None of these exceptions apply.

235.    Google is not an addressee or intended recipient of patient communications in the Patient Portals or any other Patient Portal service by Google.

236.    Divulgences to Google are not covered by section 2517, which relates to divulgences to governmental agencies and in court testimony.

237.    Divulgences to Google are not covered by Section 2511(2)(a), which provides that, "It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing

54

or random monitoring except for mechanical or service quality control checks." This does not apply here because divulgences to Google are not a necessary incident to the rendition of Patient Portal services or to the protection of the rights or property of Cerner.

238.     Divulgences to Google are not covered by Section 2703 because that section only relates to disclosures to governmental entities.

239.     The exception for "lawful consent" does not apply because Cerner did not obtain the "lawful consent" of any originator, addressee, or intended recipient of Patient Portal communications.

240.     There was no consent obtained at all from patients.

241.     Any purported consent from a healthcare provider or any other covered entity to disclose communications content to Google relating to the Patient Portal was not "lawful consent" because it violates Cerner's obligations under federal and Missouri law.

242.     Google is not "a person employed or authorized, or whose facilities are used, to forward such communication to its destination."

243.     As a direct and proximate result of Cerner's violation of the ECPA, Plaintiffs and Class members were damaged by Cerner's conduct in that:

    a.    Cerner harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Cerner eroded the essential confidential nature of the provider-patient relationship;

    d.    Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e.   Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included Cerner's duty to maintain confidentiality; and

f.   Cerner's actions diminished the value of Plaintiffs and Class members' personal information.

244.   In violating the ECPA, Cerner's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, or ill-will or fraud. Specifically:

a.   Cerner knew it had a duty to safeguard and keep confidential Plaintiffs' protected health information under HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.   Cerner knew that Plaintiffs reasonably expected their communications with their healthcare providers to remain private;

c.   Cerner knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.   Cerner knew it was prohibited by law from disclosing Plaintiffs' communications;

e.   Cerner knew that its use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.   Cerner nonetheless knowingly and deliberately divulged Plaintiffs' health communications to third-party advertisers without Plaintiffs' consent, in a knowing violation of the ECPA;

g.   Cerner carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' private healthcare communications at Plaintiffs'

expense and for Cerner's own financial gain; and

h.     Cerner's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' health communications under the guise of offering healthcare services to Plaintiffs.

245.    Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT IV

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2702(a)(2)
### Divulgence of Stored Communications Content by an RCS Provider

246.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

247.    Title II, the Stored Communications Act portion of the Electronic Communications Privacy Act, provides that "a person or entity providing a remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service—(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service; (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communication for purposes of providing any services other than storage or computer processing." 18 U.S.C. § 2702(a)(1).

248.    A "remote computing service" is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system."

249.    Cerner's Patient Portals are a remote computing service because they store patient

records relating to prescriptions, communications with providers, medical records, test results, and appointments.

250. Cerner's services are "to the public" for the reasons set forth above.

251. The "content" at issue is the same as set forth above.

252. The communications content is maintained on Cerner's Patient Portals on behalf of the patients and providers and received by electronic transmission from subscribers and customers.

253. The communications are maintained on the Patient Portals solely for the purpose of providing storage of the records and computer processing services to subscribers and customers and Cerner is not authorized to use the information other than for the storage and processing.

254. The exceptions set forth in 18 U.S.C. § 2702(b) also apply to remote computing service providers. These exceptions do not apply here for the same reasons set forth above.

255. As a direct and proximate result of Cerner's violation of the ECPA, Plaintiffs and Class members were damaged by Cerner's conduct in that:

    a.    Cerner harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

    c.    Cerner eroded the essential confidential nature of the provider-patient relationship;

    d.    Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    e.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included Cerner's duty to maintain

confidentiality; and

f.      Cerner's actions diminished the value of Plaintiffs and Class members' personal information.

256.    In violating the ECPA, Cerner's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiffs, and involved a recklessly negligent or callous indifference to patients' protected rights under both state and federal law. Indeed, Cerner not only intentionally harmed patients without just cause but also acted with a deliberate and flagrant disregard for the safety and privacy of the patients who used its patient portals. Specifically:

a.      Cerner knew it had a duty to safeguard and keep confidential Plaintiffs' protected health information under HIPAA, the patient-provider relationship, and their express promises to Plaintiffs;

b.      Cerner knew that Plaintiffs reasonably expected their communications with their healthcare providers to remain private;

c.      Cerner knew that Plaintiffs' communications involved private and sensitive matters concerning Plaintiffs' healthcare;

d.      Cerner knew it was prohibited by law from disclosing Plaintiffs' communications;

e.      Cerner knew that its use of the tracking technology at issue violated their duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

f.      Cerner nonetheless knowingly and deliberately divulged Plaintiffs' health communications to third-party advertisers without Plaintiffs' consent, in a knowing violation of the ECPA;

g.      Cerner carried out its unlawful conduct with the wrongful and evil motive

to appropriate Plaintiffs' private healthcare communications at Plaintiffs' expense and for Cerner's own financial gain; and

h. Cerner's conduct was particularly egregious and reprehensible because it acquired Plaintiffs' health communications under the guise of offering healthcare services to Plaintiffs.

257. Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## COUNT V

### Tampering with Computer Data in Violation of
### Mo. Rev. Stat. §§ 569.095 & 537.525

258. Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

259. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

260. A person commits the offense of tampering with computer data if he or she knowingly and without authorization or without reasonable grounds to believe that he or she has such authorization:

(1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network; or

(2) Modifies or destroys data or programs or supporting documentation residing or existing external to a computer, computer system, or computer network; or

(3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; or

(4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network;

(5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person;

(6) Receives, retains, uses, or discloses any data he knows or believes was obtained in violation of this subsection.

261. All health care providers and their business associates owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

262. Maintaining the confidentiality of patients' Health Information is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatment.

263. Cerner owed Plaintiffs and Class members a duty of confidentiality.

264. Despite its duty not to disclose Health Information without informed consent and written authorization, Cerner disclosed information relating to Plaintiffs and Class members' medical treatment and patient status to Google without their knowledge, consent, or authorization.

265. In doing so, Cerner disclosed data to Google (and other third parties) that it knew or should have known their patients had not authorized Cerner to disclose.

266. To disclose such data to Google, Cerner modified patient computers and/or computer systems by depositing cookies on patient devices that surreptitiously commanded patients' browsers to forward duplicate copies of their communications with Cerner to Google.

267. The information disclosed included Health Information, Plaintiffs' and Class members' status as patients, and the exact contents of communications exchanged between Plaintiffs and/or Class members with their healthcare providers, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to and logouts from Cerner's Patient Portals.

268. The disclosure of Health Information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class members' legal rights.

269. Plaintiffs and Class members did not consent to, authorize, or know about Cerner's

disclosure of their Health Information to Google and other third parties or Cerner's use of Google cookies at the time it occurred. Plaintiffs and Class members never agreed that their Health Information could be collected, used, and monetized by Google.

270.     Cerner's intentional disclosure of patients' Health Information to a third-party advertising company like Google and corresponding deposit of Google cookies without consent would be highly offensive to a reasonable person. Plaintiffs and Class members reasonably expected that their Health Information would not be collected, used, and monetized by third party advertising companies.

271.     Cerner's disclosure of Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

272.     Given the nature of the Health Information that Cerner disclosed to Google, such as details about patients' doctors, conditions, medical treatments, and patient status, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

273.     Plaintiffs and Class members own their Health Information.

274.     Plaintiffs and Class members reasonably believed and expected that Cerner would operate its Patient Portals free of surreptitious collection and exploitation of communications between patients and their healthcare providers. Cerner failed to do so. Plaintiffs and Class members would not have used the Cerner Patient Portal if they knew that Cerner would share their Health Information with Google without their knowledge or written consent.

275.     Missouri Revised Statute Section 537.525 authorizes parties like Plaintiffs and Class members to bring a civil action against any person who violates Section 569.095 for compensatory damages and reasonable attorney's fees.

276.     Cerner's breach caused Plaintiffs and Class members, at minimum, the following

damages:

a. Cerner harmed Plaintiffs' and Class members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no more;

c. Cerner eroded the essential confidential nature of the provider-patient relationship;

d. Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included Cerner's duty to maintain the confidentiality of patient's protected health information; and

f. Cerner's actions diminished the value of Plaintiffs and Class members' personal information.

277. Plaintiffs and Class members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

278. Plaintiffs and Class members have been damaged as a direct and proximate result of Cerner's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

279. Plaintiffs and Class members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as well as a disgorgement of profits made by Cerner as a result of their intrusions on Plaintiffs and Class members' privacy.

280.     Plaintiffs and Class members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT VI

### Unjust Enrichment/Quasi-Contract

281.     Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

282.     Plaintiffs bring this claim on behalf of themselves and all members of the Class.

283.     Plaintiffs and Class members conferred a benefit on Cerner in the form of valuable sensitive medical information that Cerner collected from Plaintiffs and Class members under the guise of keeping this information private. Cerner collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties.

284.     Plaintiffs and the Class members would not have used Cerner's services if they had known that Cerner would collect, use, and disclose this information to third parties.

285.     Cerner unjustly retained those benefits at the expense of Plaintiffs and Class members because Cerner's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

286.     The benefits that Cerner derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles for Cerner to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged herein.

287.     Cerner should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that it received, and such other relief as the Court may deem just and proper.

## COUNT VII

**Invasion of Privacy—Unreasonable Intrusion upon the Seclusion of Another**

288.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

289.    Missouri established a right to privacy in Article 1, Section 15 of the Missouri Constitution.

290.    Under Missouri law, there is a tortious intrusion on seclusion when there is an intentional intrusion on the solitude, seclusion, or private affairs of another by a means that is unreasonable or highly offensive to a reasonable person.  A claim for unreasonable intrusion upon the seclusion of another encompasses three elements: (1) the existence of a secret and private subject matter; (2) a right in the plaintiff to keep that subject matter private; and (3) the obtaining by the defendant of information about that subject matter through unreasonable means.  *Corcoran v. Southwestern Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo. App. 1978).

291.    Plaintiffs and Class members had a legitimate and reasonable expectation of privacy with respect to their Health Information and were accordingly entitled to protection of this Information against the acquisition and disclosure of their personal health information by unreasonable means.

292.    Cerner owed a duty to Plaintiffs and Class members to protect the confidentiality of their Health Information and not to share such Information with third parties for marketing purposes without the express written consent of Plaintiffs and Class members.

293.    Plaintiffs and Class members did not authorize, consent, know about, or take any action to indicate consent to Cerner's conduct alleged herein.

294.    Cerner's conduct described herein was intentional.

295.    The unauthorized acquisition and appropriation of Plaintiffs' and Class members'

Health Information would be highly offensive to a reasonable person.

296.     The intrusion was into subject matter that was private and is entitled to be private. Plaintiffs and Class members disclosed their Health Information to Cerner with the understanding that it would only be used for their medical treatment and that such Information would be kept confidential and protected from intrusion by third parties.

297.     The unauthorized disclosure of Plaintiffs' and Class Members' Health Information by Cerner constitutes an unreasonable intrusion upon Plaintiffs' and Class Members' seclusion, as to both their persons, their private affairs, and private concerns of a kind that would be highly offensive to a reasonable person.

298.     Cerner acted with a knowing mind when it intentionally disclosed Plaintiffs and Class Members' Health Information to Google.  Cerner further invaded Plaintiff' and Class Members' privacy by failing to implement adequate data security measures, despite its obligations to protect patients' Health Information

299.     The placement of third-party cookies on Plaintiffs' and Class Members' browsers via on Cerner's Patient Portals constitutes an unreasonable intrusion upon Plaintiffs' and Class members' seclusion, as to both their persons, their private affairs, and private concerns of a kind that would be highly offensive to a reasonable person.

300.     Cerner acted with a knowing mind when it intentionally deployed third-party cookies on its Patient Portals, where Plaintiffs and Class members shared their Health Information.

301.     Cerner had notice and knew that its deployment of third-party cookies on its Patient Portals, where Plaintiffs' and Class members shared their Health Information, would cause injury to Plaintiffs and Class members.

302.     As a proximate result of Cerner's acts and omissions, Plaintiffs' and Class members' Health Information was subject to intrusion, causing Plaintiffs and Class members to suffer injury,

including, at minimum, the following damages:

    *a.*    Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

    *b.*    Cerner eroded the essential confidential nature of the doctor-patient and provider-patient relationship; and

    *c.*    Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs and Class members' knowledge, consent, or authorization and without sharing the benefit of such value.

303.    Plaintiffs and Class members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Cerner's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiffs and Class members. Accordingly, Plaintiffs and Class members seek such injunctive relief as the Court deems legal, equitable, and proper.

**COUNT VIII**

**Identity Theft Mo. Rev. Stat. 570.223**

304.    Plaintiffs individually and on behalf of the other Class members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

305.    Section 570.233 provides that a person "commits the offense of identity theft if he or she knowingly and with the intent to deceive or defraud obtains, possesses, transfers, uses, or attempts to obtain, transfer, or use, one or more means of identification not lawfully issued for his or her use."

306.    "Deceive" is defined as "making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind, or concealing a material fact as to the terms of a contract or agreement." Mo. Rev. Stat. § 570.010(8).

307. "Means of identification" is defined under § 570.010(15) as "*anything* used by a person as a means to uniquely distinguish himself or herself."

308. Cerner committed identity theft under § 570.223 by knowingly obtaining, using, and transferring to third-party marketing companies Plaintiffs' and Class members' "means of identification" in the form of IP addresses, cookie identifiers, account numbers, and browser-fingerprint information without Plaintiffs' and Class members' authorization.

309. For example, when a patient clicked the button to log into Cerner's Patient Portal, Cerner used and transferred patients' personal identifiers by causing the identifiers to be transmitted to Google, notifying Google, among other things, that the patient has attempted to log into Cerner's Patient Portal.

310. Cerner's use and transfer of Plaintiffs' and Class members' means of identification occurred because Cerner installed source code on their website that resulted in the transfer of Plaintiffs' and Class members' personally identifiable information to Google and other third-party marketing companies. Cerner deceived Plaintiffs and Class members into providing such personally identifiable data by making a series of false representations in its privacy policies.

311. For example, Cerner expressly promised patients that any "Site usage information" it collected about patients would be "de-identified, meaning your personally identifiable information is removed and cannot be connected to you in any way." This representation was false because the data that Cerner shared with Google contained identifiers, including IP addresses and related information, which enabled Google to identify patients' actual identifies.

312. Cerner also intentionally concealed a material fact from Plaintiffs and Class members by failing to disclose that their most sensitive personal communications with Cerner were routinely and automatically disclosed to third-party marketing companies.

313. Section 570.223.4 provides that "any person who commits an act made unlawful by

68

subsection 1 of this section shall be liable to the person to whom the identifiable information belonged for civil damages of up to five thousand dollars for each incident, or three times the amount of actual damages, whichever amount is greater. A person damaged as set forth in subsection 1 of this section may also institute a civil action to enjoin and restrain future acts that would constitute a violation of subsection 1 of this section."

314. As a direct and proximate result of Cerner's violation of § 570.223, Plaintiffs and Class members were damaged by Cerner in multiple ways, including at minimum, the following damages:

    a.     Sensitive and confidential information that Plaintiffs and Class members intended to remain private is no longer private;

    b.     Cerner harmed Plaintiffs' and Class members' privacy interests;

    c.     Cerner eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

    d.     Cerner took something of value from Plaintiffs and Class members and derived benefit therefrom without Plaintiffs and Class members' knowledge, consent, or authorization and without sharing the benefit of such value; and

    e.     Statutory damages as prescribed by Mo. Rev. Stat. § 570.223.4.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully requests relief against Cerner as set forth below:

    a.     Certifying the Class and appointing Plaintiffs as the Class's representatives;

    b.     Finding that Cerner's conduct as alleged herein was unlawful;

69

c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Cerner from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent; requiring Cerner to implement adequate procedures for ensuring the confidentiality of patients' health information; mandating that Cerner hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Cerner provide written verifications on a quarterly basis to the court and counsel for Plaintiffs in the form of a declaration under oath that the above steps.

d. Awarding statutory damages of $5,000 per Plaintiffs and Class Members pursuant to Mo. Rev. Stat. § 570.223.4;

e. Awarding statutory damages of $5,000 per violation for Cerner's violation of the Electronic Communications Privacy Act;

f. Imposing a constructive trust against Defendants through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendants;

g. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

h. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

i. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

j. Awarding costs of suit; and

k. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: August 1, 2025                                Respectfully submitted,


                                    By:  /s/ Jason "Jay" Barnes_____

                                         Jason "Jay" Barnes
                                         Jaybarnes@simmonsfirm.com
                                         Eric Johnson
                                         ejohnson@simmonsfirm.com
                                         SIMMONS HANLY CONROY
                                         231 S. Bemiston Avenue, #525
                                         St. Louis, Missouri 63105
                                         Telephone: (212) 784-6400

                                         **COUNSEL FOR PLAINTIFFS,
                                         INDIVIDUALLY AND ON BEHALF OF ALL
                                         OTHERS SIMILARY SITUATED**



                        **CERTIFICATE OF SERVICE**

        I hereby certify that on August 1, 2025, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system.


Date: August 1, 2025


                                          /s/ Jason "Jay" Barnes_____
                                         Jason 'Jay' Barnes
                                         jaybarnes@simmonsfirm.com
                                         231 S. Bemiston Avenue, #525
                                         St. Louis, Missouri 63105
                                         Telephone: (212) 784-6400

                                         *Counsel for Plaintiffs and the Putative Class*