**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| GARY WHITBY and JEREMY PAQUETTE,<br><br>Plaintiffs,<br><br>v.<br><br>CERNER CORPORATION,<br><br>Defendant. | ) | Case No. 2:25-CV-04087-BP<br><br>Hon. Beth Phillips<br><br>**ORAL ARGUMENT REQUESTED** |

**SUGGESTIONS IN SUPPORT OF**
**DEFENDANT CERNER CORPORATION'S MOTION TO DISMISS**
**PURSUANT TO THE FIRST-FILED RULE AND RULES 12(b)(1) AND 12(b)(6)**

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

A. Plaintiffs' Allegations .......... 2

B. Cerner's Use Of Google Analytics .......... 3

C. Prior Related Litigation Against Cerner .......... 6

ARGUMENT .......... 9

I. Plaintiffs' Action Is Barred By The First-Filed Rule .......... 9

II. Plaintiffs Lack Standing Because They Did Not Suffer An Injury In Fact .......... 10

III. Plaintiffs Fail To Plausibly Allege Any Cause Of Action .......... 17

A. Plaintiffs Fail To Plausibly Allege Any Claim Under The ECPA .......... 17

B. Plaintiffs Fail To Allege Tampering With Computer Data In Violation of Mo. Rev. Stat. §§ 569.095 & 537.525 .......... 20

C. Plaintiffs Fail To Allege Intrusion Upon The Seclusion Of Another .......... 21

D. Plaintiffs Fail To Allege Identity Theft .......... 22

E. Plaintiffs Fail To Allege Unjust Enrichment .......... 23

IV. If The Court Dismisses The Complaint Under Rule 12(b)(6), It Should Be Dismissed With Prejudice .......... 24

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Adams v. PSP Group, LLC*,
691 F. Supp. 3d 1031 (E.D. Mo. 2023)....................11, 12

*Advanced Physical Therapy, LLC v. Apex Physical Therapy, LLC*,
2017 WL 9717215 (W.D. Mo. July 6, 2017)....................9, 10

*Anzaldua v. Northeast Ambulance & Fire Protection District*,
793 F.3d 822 (8th Cir. 2015)....................20

*Baker v. Akumin*,
2024 WL 1931480 (S.D. Fla. Apr. 16, 2024)....................16

*Beber v. NaySay Holdings, LLC*,
140 F.4th 453 (8th Cir. 2025)....................9

*Braitberg v. Charter Communications, Inc.*,
836 F.3d 925 (8th Cir. 2016)....................14

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020)....................21

*Buckley v. Hennepin County*,
9 F.4th 757 (8th Cir. 2021)....................17

*Campbell v. Accounts Receivable Management, Inc.*,
2015 WL 4425823 (W.D. Mo. July 20, 2015)....................23

*Childs v. Williams*,
825 S.W.2d 4 (Mo. Ct. App. 1992)....................13

*Consultus, LLC v. CPC Commodities*,
2022 WL 345653 (W.D. Mo. Feb. 4, 2022)....................20

*Corcoran v. Southwestern Bell Telephone Co.*,
572 S.W.2d 212 (Mo. Ct. App. 1978)....................13, 22

*Cox v. Valley Hope Ass'n*,
2016 WL 4680165 (W.D. Mo. Sept. 6, 2016)....................16

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024)....................25

*Duqum v. Scotttrade, Inc.*,
2016 WL 3683001 (E.D. Mo. July 12, 2016), *aff'd sub nom. Kuhns v. Scottrade, Inc*., 868 F.3d 711 (8th Cir. 2017) ....................14, 15

*Gallagher v. Santander Consumer USA, Inc.*,
125 F.4th 865 (8th Cir. 2025) ....................10

*Gilday v. Dubois*,
124 F.3d 277 (1st Cir. 1997) ....................18

*Hennessey v. Gap, Inc.*,
86 F.4th 823 (8th Cir. 2023) ....................23

*Hill v. MCI WorldCom Communications, Inc.*,
141 F. Supp. 2d 1205 (S.D. Iowa 2001) ....................21

*HRB Tax Group, Inc. v. National Union Fire Insurance Co. of Pittsburgh*,
2012 WL 4363723 (W.D. Mo. Sept. 21, 2012) ....................9

*Hutton v. National Board of Examiners in Optometry, Inc.*,
892 F.3d 613 (4th Cir. 2018) ....................12

*In re Amererican Medical Collection Agency, Inc. Customer Data Security Breach Litigation*,
2021 WL 5937742 (D.N.J. Dec. 16, 2021) ....................24

*In re Facebook Internet Tracking Litigation*,
140 F. Supp. 3d 922 (N.D. Cal. 2015) ....................14, 15

*In re NCB Management Services, Inc. Data Breach Litigation*,
748 F. Supp. 3d 262 (E.D. Pa. 2024) ....................24

*In re Science Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litigation*,
45 F. Supp. 3d 14 (D.D.C. 2014) ....................16

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017) ....................12

*In re Trans Union Corp., Privacy Litigation*,
326 F. Supp. 2d 893 (N.D. Ill. 2004) ....................21

*In re Zynga Privacy Litigation*,
750 F.3d 1098 (9th Cir. 2014) ....................17, 18

*J.C. v. Catholic Health System Inc.*,
2024 WL 5136236 (W.D.N.Y. Aug. 29, 2024), *report & recommendation adopted*, 2025 WL 351043 (W.D.N.Y. Jan. 31, 2025) ....................25

*Jones v. Bloomingdales.com, LLC*,
124 F.4th 535 (8th Cir. 2024) .....................................................................11, 12

*Katz-Lacabe v. Oracle America, Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ..................................................................18

*KM Tactical, LLC v. Berkshire Hathaway Specialty Insurance Co.*,
2024 WL 2951760 (W.D. Mo. May 1, 2024) ..........................................................10

*Kuhns v. Scottrade, Inc.*,
868 F.3d 711 (8th Cir. 2017) ...............................................................................16

*Kurowski v. Rush System for Health*,
2023 WL 8544084 (N.D. Ill. Dec. 11, 2023) ..........................................................26

*Kurowski v. Rush System for Health*,
683 F. Supp. 3d 836 (N.D. Ill. 2023) ....................................................................25

*McMorris v. Carlos Lopez & Assocs.*,
995 F.3d 295 (2d Cir. 2021)..................................................................................12

*Morris v. Northland Group, Inc.*,
2016 WL 3562144 (W.D. Mo. June 24, 2016) ......................................................23

*Motaref v. U.S. Dep't of State*,
2024 WL 3349040 (W.D. Mo. July 9, 2024)..........................................................11

*Motogolf.com, LLC v. Top Shelf Golf, LLC*,
528 F. Supp. 3d 1168 (D. Nev. 2021) ....................................................................21

*Murphy v. Thomas Jefferson University Hospitals, Inc.*,
2023 WL 7017734 (E.D. Pa. Oct. 10, 2023)...........................................................25

*Osborn v. United States*,
918 F.2d 724 (8th Cir. 1990) .............................................................................3, 11

*Ostrander v. DST Systems, Inc.*,
2018 WL 10799300 (W.D. Mo. Feb. 2, 2018) ....................................................9, 10

*Peel v. Credit Acceptance Corp.*,
408 S.W.3d 191 (Mo. Ct. App. 2013)....................................................................24

*Peterson v. Moldofsky*,
2009 WL 3126229 (D. Kan. Sept. 29, 2009) ..........................................................21

*Petri v. Valarity, LLC*,
2015 WL 7253061 (E.D. Mo. Nov. 17, 2015)..........................................................22

*Pulliam v. West Technology Group, LLC*,
2024 WL 356777 (D. Neb. Jan. 19, 2024)....................................................................14

*Ramirez v. LexisNexis Risk Solutions*,
729 F. Supp. 3d 838 (N.D. Ill. 2024) ..........................................................................24

*Roberts v. Roberts*,
580 S.W.3d 600 (Mo. Ct. App. 2019)..........................................................................23

*Rudolph v. Hudson's Bay Co.*,
2019 WL 2023713 (S.D.N.Y. May 7, 2019) ...................................................................14

*Ruzicka Electric & Sons, Inc. v. International Bhd. of Electrical Workers, Local 1, AFL-CIO*,
427 F.3d 511 (8th Cir. 2005) ...............................................................................13, 21

*Schriener v. Quicken Loans, Inc.*,
774 F.3d 442 (8th Cir. 2014) .......................................................................................25

*Smith v. Curators of University of Missouri*,
2017 WL 11492763 (W.D. Mo. Dec. 20, 2017) .............................................................22

*St. Anthony's Medical Center v. H.S.H.*,
974 S.W.2d 606 (Mo. Ct. App. 1998)..................................................................14, 21, 22

*Svenson v. Google Inc.*,
2016 WL 8943301 (N.D. Cal. Dec. 21, 2016)................................................................14

*Thomas v. Corwin*,
483 F.3d 516 (8th Cir. 2007) .......................................................................................22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...............................................................................................10, 11

*Tureen v. Equifax, Inc.*,
571 F.2d 411 (8th Cir. 1978) .......................................................................................13

*United States v. Dickerman*,
2017 WL 11485604 (E.D. Mo. Sept. 26, 2017), *report & recommendation adopted*,
2018 WL 10228437 (E.D. Mo. Apr. 27, 2018), *aff'd*, 954 F.3d 1060 (8th Cir. 2020)......18

*United States v. Hoeffener*,
2018 WL 2996317 (E.D. Mo. May 9, 2018), *report & recommendation adopted*,
2018 WL 2981426 (E.D. Mo. June 13, 2018), *aff'd*, 950 F.3d 1037 (8th Cir. 2020)........18

*United States v. Reed*,
575 F.3d 900 (9th Cir. 2009) .......................................................................................18

*Wiles v. Capitol Indemnity Corp.*,
280 F.3d 868 (8th Cir. 2002) ....................19

*Wright v. Anthony*,
733 F.2d 575 (8th Cir. 1984) ....................25

**DOCKETED CASES**

*Doe I v. MedStar Health, Inc.*, 23-cv-01198-JRR (D. Md.) ....................7, 8, 9, 10

*Doe v. MedStar Health, Inc.*, No. 24-C-20-000591 (Md. Cir. Ct. Balt. City) ....................6, 8

**STATUTES, RULES, AND REGULATIONS**

18 U.S.C.
§ 2510 ....................17
§ 2511 ....................17
§ 2702 ....................17

Mo. Rev. Stat.
§ 569.095 ....................20
§ 537.525 ....................20
§ 570.223 ....................22, 23

Rule 12(b)(1) ....................1, 11, 26

Rule 12(b)(6) ....................1, 17, 24, 26

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 652B cmt. a (1977) ....................21

Restatement (Second) of Torts § 652D cmt. a (1977) ....................13

## INTRODUCTION

Plaintiffs' complaint should be dismissed under the first-filed rule. It rehashes a putative class action filed by Plaintiffs' counsel against Cerner over two years ago in the District of Maryland. That action made the same allegations about web browser data shared through patient portals against Cerner and also MedStar Health, Inc., which operates hospitals and healthcare providers. The court stayed that action pending a different first-filed putative class action against MedStar in Maryland state court. The Maryland state court denied class certification and granted MedStar summary judgment because the disclosed data did not implicate "content" or "identity information." Plaintiffs then filed this duplicative putative class action. The Court should dismiss it under the first-filed rule (or, at minimum, transfer it to the District of Maryland).

Otherwise, the Court should dismiss the complaint under Rule 12(b)(1) or (b)(6). Plaintiffs' 314-paragraph, 70-page complaint can be summarized in a sentence: Cerner allegedly used Google Analytics to analyze the usage of the online patient portals that it provides to healthcare providers to help improve its product. Google Analytics provides information about how users interact with a website or app, like the patient portals—what parts they click on, what parts they visit, what parts they don't. Plaintiffs contend that Cerner's alleged use of Google Analytics caused them an Article III injury and violated several state and federal privacy laws. It did neither, as is plain from the face of the complaint. If there were any question, Cerner submits a declaration—substantially similar to one filed in the District of Maryland—demonstrating that no information of Plaintiffs was disclosed to Google giving rise to an Article III injury or cause of action. This Court should dismiss the complaint, for lack of facial or factual standing, under Rule 12(b)(1). Otherwise, it should dismiss it for claim-specific reasons under Rule 12(b)(6).

## STATEMENT OF FACTS

Cerner provides health information technology services and products to healthcare providers. Compl. ¶¶ 2, 26. Among them, Cerner hosts online patient portals. *Id.* There, patients can communicate with their providers, schedule appointments, search for physicians, pay bills, view test results and prescriptions, and otherwise manage their care online, on their healthcare providers' websites or Cerner's mobile application. *Id.* ¶¶ 2, 28. Patients are not required to use the patient portals. *Id.* ¶¶ 27, 61.

### A. Plaintiffs' Allegations

Plaintiffs are allegedly two patients who elected to use Cerner patient portals: Gary Whitby, a resident of Columbia, Missouri and a patient of University of Missouri Health Care, who has been a registered user of the HEALTHConnect patient portal since 2015,[1] and Jeremy Paquette, a resident of Durango, Colorado and a patient of Memorial Hermann Hospital in Houston, Texas, who has been a registered user of the Everyday Well patient portal since 2020. Compl. ¶¶ 13-14.

Plaintiffs allege that Cerner embedded Google Analytics on the patient portals they accessed. Compl. ¶ 115. Cerner allegedly did so "in order to gain access to the benefits of Google Analytics." *Id.* ¶ 113. "Cerner used the analytics data that it received from Google to enhance the patient portal product that it marketed and sold to health care systems." *Id.* ¶ 123.

Plaintiffs allege that by using Google Analytics, Cerner provided Google certain information about their use of the patient portals that Google Analytics then analyzed. Compl. ¶¶ 65, 77. Plaintiffs further allege that this information was shared via Google domains that include the Google Ads and Google DoubleClick advertising services. *Id.* ¶ 64.

---

[1] Plaintiffs later allege that Whitby has used the HEALTHConnect patient portal since approximately 2012. Compl. ¶ 59.

Plaintiffs allege that Cerner's use of Google Analytics injured them in four ways. Compl. ¶ 12. *First*, they claim that information "that Plaintiffs intended to remain private is no longer private." *Id. Second*, they claim Cerner's using Google Analytics "took something of value" from them for its benefit—their "personal data"—without consent or sharing the benefit; and, closely related, that Cerner's use of Google Analytics "diminished the value of [their] personal information." *Id.*; *see also id.* ¶ 39. *Third*, they claim Cerner's using Google Analytics "eroded the essential confidential nature of the provider-patient relationship." *Id. Fourth*, for their federal Electronic Communication Privacy Act (ECPA) and Missouri computer tampering claims, Plaintiffs claim that they "did not get the full value of the medical services for which they paid, which included their healthcare provider's duty to maintain confidentiality." *Id.* ¶ 199.

On this basis, Plaintiffs bring several federal and state privacy claims. They seek to certify a nationwide class of "[a]ll patients in the United States who logged into Patient Portals provided by Cerner where Google Analytics was deployed." Compl. ¶ 164.

### B. Cerner's Use Of Google Analytics

Prior to May 18, 2023, Cerner used Google Analytics in conjunction with its patient portals. Lowery Decl. ¶ 8.[2] Google Analytics is a web analytics service that allows companies like Cerner that offer web-based products to monitor website traffic for the purpose of optimizing user experience. *Id.* ¶ 9. Google Analytics configures certain data available from a website user's web browser ("web browser data") into various reports that provide insights into

---

[2] The Court may consider the contents of the Declaration of Linda Lowery in Support of Cerner Corporation's Motion to Dismiss and the exhibits attached thereto for purposes of Cerner's factual challenge to subject matter jurisdiction. *See infra* pp. 10-17; *see also Osborn v. United States*, 918 F.2d 724, 728 n.4 (8th Cir. 1990) ("The district court has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1)."); *id.* at 729 n.6 ("In a factual attack [to subject matter jurisdiction], the court considers matters outside the pleadings[.]").

website user activity—such as the total time a user spent on a website, the amount of time a user spent on each page, the order in which pages were visited, and what internal links a user clicked on a website—which can be used to improve the site. *Id.*

Plaintiffs allege that by using Google Analytics, Cerner "redirect[ed]" the following forms of web browser data to Google Analytics: "Patient IP addresses"; "Unique, persistent patient cookie identifiers"; "Device identifiers"; "Account numbers"; "URLs"; "Other unique identifying numbers, characteristics, or codes"; "Browser-fingerprints"; "Actions to log-in to Patient Portals"; "Actions to Sign Up for Patient Portals"; "Actions to log-out of Patient Portals"; "Actions taken inside Patient Portals"; and "[A]ctions that patients take on their healthcare providers' properties while logged-in to Patient Portals." Compl. ¶¶ 49-50; *see also id.* ¶¶ 65-66, 68, 185. As to the redirected "actions," Plaintiffs allege that "when a patient clicks on a link to view a specific test result or make an appointment with a specific physician," the web browser text (per Plaintiffs, "a full-string, detailed URL") showing that the patient clicked on that link was provided to Google to analyze through Google Analytics. *Id.* ¶ 51; *see also id.* ¶ 52 (alleging that Google Analytics receives "logins, page views, notifications, IP addresses, and device data" from Cerner mobile app users).

As described in more detail in Cerner's declaration, Google Analytics does not collect the contents of a web page or the contents of any messages or information shared through a website. Lowery Decl. ¶ 10. The only information that can be shared with Google Analytics is the web browser data that is transmitted from a website user's browser to a web server while a person is navigating a website. As Plaintiffs assert, this can include internet protocol (IP) addresses (the number identifying the geographic location and internet service provider (ISP) of a device using the internet, typically assigned by the internet modem a device is connected to); Uniform

Resource Locators (URLs) (a pathway identifying the location or components of a particular webpage on the internet); metadata reflecting device attributes like screen size or browser type ("user agent data"); and randomly-generated identification numbers stored as "cookies" (small text files) in a user's web browser. *Id.* For analytics purposes, cookies can be used to track a particular user's activity across subsequent visits to the same site. *Id.*

As Plaintiffs' own cited sources reflect, none of the web browser data shared with Google Analytics personally identifies specific users. *See Privacy & Terms, Types of Cookies Used by Google*, Google (archived from January 1, 2021) (cited in Compl. ¶¶ 82(b) n.10, 82(c) n.11, 82(d) n.12) ("Google Analytics is Google's analytics tool that helps website and app owners to understand how their visitors engage with their properties. Google Analytics may use a set of cookies to collect information and report site usage statistics without personally identifying individual visitors to Google."). While Plaintiffs identify a number of cookies used for other Google services, *see*, *e.g.*, Compl. ¶ 82, none of those cookies is relevant to Cerner's alleged use of Google Analytics. None of the cookie values that were available to Google through Cerner's use of Google Analytics contained identifying information about a user, and none was used to share user web browser data with other Google services outside of the Google Analytics environment.[3] Lowery Decl. ¶ 18.

[3] For example, Cerner's use of Google Analytics did not involve the "NID," "IDE," "DSID," or other Google cookies identified in the Complaint (*see* Compl. ¶¶ 66-70, 82) that would allow Google to connect web browser data to an individual Google accountholder for advertising purposes. *See* Lowery Decl. ¶¶ 16, 18, 20. Starting in 2017, Cerner even further anonymized the browser data shared with Google Analytics by truncating user IP addresses and removing any unique identification numbers associated with a patient portal user from URLs. *See id.* ¶ 17. But even prior to these changes, the web browser data shared with Google Analytics could not be used to identify a specific patient.

Cerner's use of Google Analytics was for internal purposes only, to analyze patient portal use and improve user experience. Lowery Decl. ¶ 13; *see also* Compl. ¶ 123. Cerner did not use Google Analytics for marketing purposes—indeed it does not engage in any direct-to-consumer marketing to portal patients. Lowery Decl. ¶ 20. In addition to maintaining its own Google Analytics account, until June 12, 2023, Cerner allowed its healthcare clients to add their own custom Google Analytics scripting to their patient portals. *Id.* ¶ 30. To the extent Cerner clients configured their own Google Analytics accounts to share information with other Google domains or provide for targeted advertising, Cerner had no control over those accounts or their settings. *Id.* ¶¶ 24-25, 36.

### C. Prior Related Litigation Against Cerner

This is the third putative class action brought by Plaintiffs' counsel asserting claims arising out of the use of Google Analytics on Cerner patient portals.

The first was filed in Maryland state court on January 31, 2020, by a single anonymous plaintiff. It named as defendant the Maryland-based healthcare provider MedStar Health, Inc., and it brought Maryland statutory and common law claims analogous to the ones asserted in this action, including alleged violations of the Maryland Wiretap Act and invasion of privacy. *See Doe v. MedStar Health, Inc.*, No. 24-C-20-000591 (Md. Cir. Ct. Balt. City) ("State *MedStar*"), January 31, 2020 Complaint. After filing an amended complaint adding other anonymous plaintiffs, the named plaintiffs moved to certify a class of "[a]ll Maryland residents who are, or were, patients of MedStar Health, Inc., or any of its affiliates and who exchanged communications at the MedStar web properties, including the myMedStar patient portal, prior to November 13, 2021." *Id.*, March 10, 2023 Order Denying Class Certification at 4. The court denied class certification.

Two months after losing class certification in Maryland state court, on May 5, 2023, Plaintiffs' counsel filed a putative class action on behalf of two anonymous plaintiffs in the United States District Court for the District of Maryland against both Cerner and MedStar. *See Doe I v. MedStar Health, Inc.*, 23-cv-01198-JRR (D. Md.) ("Federal *MedStar*"), Dkt. 1 (Complaint). The Federal *MedStar* action brought the same state statutory and common law claims as the State *MedStar* action in addition to new federal ECPA claims—thus raising essentially the same claims as in this action. One of the original anonymous Federal *MedStar* plaintiffs was an anonymous State *MedStar* plaintiff, too. The Federal *MedStar* complaint was filed on behalf of two putative classes: (1) a "Med[S]tar Patient Class," defined as "[a]ll MedStar patients who used the myMedStar patient portal from November 14, 2021 until such time that Defendants remove [sic] Google source code from the myMedStar Patient Portal"; and (2) a "Cerner Patient Class," defined as "[a]ll patients in the United States who used patient portal communication services provided by Cerner where Google or other third-party source code was installed to place Google or other third-party cookies on patient devices and re-direct identifiers and communications content to Google while the patient was using a Cerner Patient Portal." *Id.* ¶ 198.

On October 11, 2023, with Cerner and MedStar's motions to dismiss and Cerner's opposition to plaintiff's preliminary injunction motion briefed but not decided, the District of Maryland stayed the case pending resolution of the State *MedStar* action, over plaintiff's objection. Federal *MedStar* Dkt. 53 (Order Granting Stay). The court emphasized "the extraordinary amount of time that has been spent litigating the state case, which has a considerable amount of overlap." *Id.* Dkt. 54 (Tr. of the Motion-to-Stay Hearing) at 88:9-11; *see also id.* at 88:24-89:2 ("[J]udicial economy … weighs in favor of a stay. There are two separate

cases about substantially similar issues, and the state case is procedurally far [ahead]."); Dkt. 53 (Order Granting Stay) at 1 (referring to "the reasons set forth on the record" at the hearing on the motion).

On June 26, 2024, after full discovery and four and a half years of litigation, the State *MedStar* court granted summary judgment in favor of MedStar as to all claims. *See* State *MedStar*, June 26, 2024 Order on Motion for Summary Judgment. The court held that (1) the type of information at issue—which "doesn't provide any information about any particular disorder … [or] any other healthcare information"—was "*not content*" under the Maryland Wiretap Act, and (2) "there is no evidence that identity information was transferred." *Id.*, Transcript of June 26, 2024 Hearing on Motion for Summary Judgment at 128:18-20, 129:13-20 (emphasis added), 130:2-12. Plaintiffs appealed; briefing was completed on April 25, 2025, and the appeal has been docketed for the state appellate court's November 2025 session; but oral argument has not yet been scheduled. Federal *MedStar* Dkt. 65 (Joint Status Report). The Federal *MedStar* action remains stayed pending the State *MedStar* appeal.

On April 29, 2025, Plaintiffs' counsel filed this case. As noted, it asserts the very same federal claims and the parallel state law statutory and common law claims as the prior two cases, just now under Missouri law. It too was initially brought on behalf of anonymous plaintiffs. And like with the "Cerner Patient Class" in the Federal *MedStar* action, this case is brought on behalf of a putative class of "[a]ll patients in the United States who logged into Patient Portals provided by Cerner where Google Analytics was deployed." *Compare* Compl. ¶ 164, *with* Federal *MedStar* Dkt. 1 ¶ 198 (suing on behalf of a class of "[a]ll patients in the United States who used patient portal communication services provided by Cerner where Google or other third-party source code was installed[.]").

## ARGUMENT

### I. Plaintiffs' Action Is Barred By The First-Filed Rule

"It is well established that when the same or parallel disputes are filed in two different federal districts, the case that is filed first is the one that should proceed." *Advanced Physical Therapy, LLC v. Apex Physical Therapy, LLC*, 2017 WL 9717215, at *2 (W.D. Mo. July 6, 2017) (collecting Eighth Circuit precedent). "The rule promotes judicial economy: it is more efficient and sensible to allow a single court to resolve the issues in the case[.]" *Id.* Courts "generally find cases to be parallel when their issues and parties are substantially similar." *Ostrander v. DST Sys., Inc.*, 2018 WL 10799300, at *2-3 (W.D. Mo. Feb. 2, 2018) (collecting cases and dismissing case under first-filed rule); *see also HRB Tax Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2012 WL 4363723, at *2 (W.D. Mo. Sept. 21, 2012) ("'Parallel litigation' is not limited in application to litigation involving only the same parties and the same claims," but rather also applies to cases that "have issues that substantially overlap.").

"Here, there is no dispute that the Missouri case and the [Maryland] case raise the same issues" and so constitute parallel litigations. *Advanced Physical Therapy*, 2017 WL 9717215, at *2. Both federal complaints name Cerner as defendant. They bring the same federal and parallel state claims. They are filed on behalf of overlapping putative nationwide classes, and were brought by anonymous named plaintiffs (before this Court rejected anonymity). They use nearly identical language to describe the legal and factual questions supposedly common to the respective classes. *Compare* Federal *MedStar* Dkt. 1 ¶ 1, *with* Compl. ¶ 1. They are parallel.

No "compelling circumstances … justify permitting the second-filed case to proceed." *Advanced Physical Therapy*, 2017 WL 9717215, at *2. The first federal action was not "filed in apparent anticipation of" this one, but two years before it. *Beber v. NaySay Holdings, LLC*, 140

F.4th 453, 460 (8th Cir. 2025). This second action is not a defendant's "declaratory judgment action designed to thwart a remedy-seeking plaintiff's choice of forum." *Advanced Physical Therapy*, 2017 WL 9717215, at *2. Nor has this "second-filed suit [] progressed significantly further than the first-filed suit," *id.*—on the contrary, the first-filed Maryland federal action has already completed briefing for a motion to dismiss, a motion for a preliminary injunction, and a motion to stay, which the court granted after a three-hour hearing, Federal *MedStar* Dkt. 54.

Because a "parallel case, raising the same issues as this one, was filed before this suit was commenced and is pending" in the District of Maryland, *Advanced Physical Therapy*, 2017 WL 9717215, at *3, the Court should dismiss this case under the first-filed rule, *see Ostrander*, 2018 WL 10799300, at *3.[4]

## II. PLAINTIFFS LACK STANDING BECAUSE THEY DID NOT SUFFER AN INJURY IN FACT

To establish Article III standing and so subject matter jurisdiction, a plaintiff must have experienced "an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "'Central to assessing concreteness is whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms.'" *Gallagher v. Santander Consumer USA, Inc.*, 125 F.4th 865, 868 (8th Cir. 2025) (quoting *TransUnion*, 594 U.S. at 417). A plaintiff bears this burden for both statutory and common law causes of action because "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that

[4] Alternatively, the Court could stay this case or transfer it to the District of Maryland. *See, e.g.*, *KM Tactical, LLC v. Berkshire Hathaway Specialty Ins. Co.*, 2024 WL 2951760, at *2 (W.D. Mo. May 1, 2024) (staying case under first-filed rule); *Advanced Physical Therapy*, 2017 WL 9717215, at *3 (transferring case under first-filed rule).

violation in federal court." *TransUnion*, 594 U.S. at 427; *see also id.* ("[U]nder Article III, an injury in law is not an injury in fact.").

"Federal Rule of Civil Procedure 12(b)(1) requires the Court to dismiss a complaint if it lacks subject matter jurisdiction to hear a dispute." *Motaref v. U.S. Dep't of State*, 2024 WL 3349040, at *1 (W.D. Mo. July 9, 2024). In moving to dismiss under Rule 12(b)(1), defendants may assert both facial and factual challenges to subject matter jurisdiction. *See, e.g.*, *Osborn v. United States*, 918 F.2d 724, 729-30 (8th Cir. 1990). Facial challenges are "restrict[ed] to the face of the pleadings," while "[i]n a factual attack, the court considers matters outside the pleadings." *Id.* at 729 n.6. None of Plaintiffs' four alleged injuries confers standing on the face of the complaint. If there is any question, then the facts prove they suffered no injury.

*First*, it is not enough that information that Plaintiffs allegedly "intended to remain private is no longer private." Compl. ¶ 12. To start, the Eighth Circuit has held that disclosing "mouse movements, clicks, and keystrokes" does not establish a concrete injury to privacy interests under Article III. *See Jones v. Bloomingdales.com, LLC*, 124 F.4th 535, 540 (8th Cir. 2024); *see also Adams v. PSP Grp., LLC*, 691 F. Supp. 3d 1031, 1042 (E.D. Mo. 2023) ("[C]licking buttons and links … simply do[es] not rise to the level of a concrete harm."). Nothing that Plaintiffs plausibly allege was disclosed to Google Analytics—namely, certain device identifiers and "actions" they took in the patient portals, Compl. ¶¶ 49-50, 65-66, 68, 185, 218—constitutes "information that a website visitor could reasonably expect to keep private from the website owners or their agents." *Jones*, 124 F.4th at 540. "[W]hen a patient clicks on a link to view a specific test result or make an appointment with a specific physician," Compl. ¶ 51, patients do not plausibly intend that click to be private from Cerner or its agents. Nor have Plaintiffs plausibly alleged that Cerner's disclosures to Google Analytics revealed their

individual identities as patients. *See id.* ¶ 36. The "patient identifiers" that Plaintiffs allege were disclosed to Google at most identify the *device* being used to navigate a patient portal, not the identity of the individual user. *See id.* ¶¶ 65-68. While Plaintiffs spin hypotheticals as to how certain cookies used in connection with other Google services *might* be used to link to the identities of Google accountholders, *see id.* ¶ 70, Plaintiffs do not allege that their own identities were revealed in this way (or even that they are themselves Google accountholders). And if the Court looks beyond the face of the complaint to the facts, they prove that the web browser data Cerner shared with Google Analytics was limited to data reflecting certain actions taken on the patient portal and certain device identifiers—none of which reflected the contents of any webpage or message, or could be used to reveal the identity of a user. *See* Lowery Decl. ¶¶ 18-19. Having Google analyze Plaintiffs' "'clicks'" is comparable to "a security camera at a physical store … record[ing] how customers react to a display of products." *Jones*, 124 F.4th at 540. The "clicking [of] buttons and links on [a] website … simply do[es] not rise to the level of a concrete harm." *Adams*, 691 F. Supp. 3d at 1042.

Even if this information gave rise to a privacy interest capable of Article III injury—and it does not—its mere disclosure, standing alone, does not cause an injury-in-fact. Courts have faced this question repeatedly in the data-breach context and repeatedly reached this conclusion. *See In re SuperValu, Inc.*, 870 F.3d 763, 769-772 (8th Cir. 2017) (disclosure without "misuse" or the "substantial risk of future" misuse "do[es] not support standing"); *see Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 621-622 (4th Cir. 2018) ("[A] mere compromise of personal information, without more, fails to satisfy the injury-in-fact element[.]"); *McMorris v. Carlos Lopez & Assocs.*, 995 F.3d 295, 303 (2d Cir. 2021) (identifying additional "non-exhaustive factors" to determine whether plaintiffs bringing claims "based on an unauthorized

data disclosure … have adequately alleged an Article III injury in fact"). In those cases, where data was stolen by bad actors, courts have still required more allegations of actual or likely misuse. Here, Plaintiffs allege disclosure only to Google, only for purposes of allegedly showing them more-relevant advertisements, which they do not even allege to have seen. *See, e.g.*, Compl. ¶¶ 4, 31, 123. The unrealized possibility of seeing more useful ads is not an Article III injury. Looking beyond the complaint, the facts (that Plaintiffs' counsel has known for over two years) show that Cerner did not use Google Analytics in any way for marketing purposes and did not configure its HealtheLife patient portals to support the use of Google marketing tools like Google Ads and DoubleClick. *See* Lowery Decl. ¶¶ 20, 32; *id.* Ex. 1 ¶¶ 18, 29. As Plaintiffs' counsel well knows, Cerner—a provider of health information technology systems and services to hospitals and clinics—has no cause to market its products to individual patients, and does not. *See id.* Ex. 1 ¶ 18.

Sharing information between businesses for business purposes, on the other hand, bears no resemblance to any historically recognized intangible privacy injury. Those recognized injuries involved disclosure "to the public in general or to a large number of persons." *Childs v. Williams*, 825 S.W.2d 4, 7 (Mo. Ct. App. 1992) (citing *Tureen v. Equifax, Inc.*, 571 F.2d 411, 419 (8th Cir. 1978)); Restatement (Second) of Torts § 652D cmt. a (1977). They required that the defendant obtained the information "through some method objectionable to the reasonable person." *Ruzicka Elec. & Sons, Inc. v. Int'l Bhd. of Elec. Workers, Loc. 1, AFL-CIO*, 427 F.3d 511, 524 (8th Cir. 2005) (quoting *Corcoran v. Sw. Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo. Ct. App. 1978)). By Plaintiffs' own allegations, Cerner obtained information about their use of its patient portals in the ordinary course of its business, and that information was allegedly shared with Google by Cerner's use of Google Analytics "to enhance the patient portal product."

Compl. ¶ 123. The facts bear that out: Cerner maintained a Google Analytics account for internal purposes, to monitor website traffic and optimize user experience. *See* Lowery Decl. ¶ 13. These circumstances fall well outside historically recognized intangible privacy injuries. *See, e.g.*, *St. Anthony's Med. Ctr. v. H.S.H.*, 974 S.W.2d 606, 610 (Mo. Ct. App. 1998) (holding that a medical center obtaining medical records from its patients was not objectionable or unreasonable because it was in the ordinary course of business).

*Second*, Plaintiffs' claim that Cerner's using Google Analytics on patient portals "took something of value" from them for its benefit (their "personal data") and "diminished the value of [their] personal information" also fails to show a concrete injury. Compl. ¶ 12. Again, courts have repeatedly held that the alleged diminished value in personal information from its mere disclosure does not amount to an injury in fact. *See, e.g.*, *Braitberg v. Charter Comm'ns, Inc.*, 836 F.3d 925, 931 (8th Cir. 2016) (dismissing case because plaintiffs failed to allege the retention of personal information constitutes a "concrete and particularized harm to the value of that information"); *Duqum v. Scottrade, Inc.*, 2016 WL 3683001, at *7 (E.D. Mo. July 12, 2016) ("Most courts have found that similar allegations [regarding monetary harm stemming from deprivation of personal information] are insufficient to demonstrate an injury in fact.") (collecting cases), *aff'd sub nom. Kuhns v. Scottrade, Inc.*, 868 F.3d 711 (8th Cir. 2017); *Pulliam v. W. Tech. Grp., LLC*, 2024 WL 356777, at *8 (D. Neb. Jan. 19, 2024) ("[T]he Court holds that diminished value of Plaintiffs' personal information is not an injury sufficient to confer standing."); *see also In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922 (N.D. Cal. 2015); *Svenson v. Google Inc.*, 2016 WL 8943301, at *9 (N.D. Cal. Dec. 21, 2016); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *7 (S.D.N.Y. May 7, 2019). This question often arises after data breaches, when personal information falls into the hands of bad actors and often is then

available publicly or on the dark web. Still then, courts reach the same conclusion. *See, e.g.*, *Duqum*, 2016 WL 3683001, at *7 (finding allegations "insufficient to demonstrate an injury in fact" because "[p]laintiffs do not allege any facts showing how their [personal information] became less valuable as a result of the data breach").

Plaintiffs do not plausibly allege that information about where they clicked on Cerner's patient portal is useful to anyone but Cerner, to improve its own product. They do not allege that it is independently valuable to them; that "anyone was willing to pay for" it, *In re Facebook*, 140 F. Supp. 3d at 930; or that Cerner's using Google Analytics "lessened the value of" it "or affected its marketability," *id.* They do not allege "that they ever intended to sell" it, that "they ever attempted to sell it … and were unable to do so" after Cerner used Google Analytics, or that "they ever attempted to sell it after" Cerner used Google Analytics "and were forced to accept a lower price than they would have had." *Duqum*, 2016 WL 3683001, at *7. None of this would be plausible if they had alleged it: It is beneficial to Cerner to know how users interact with its portal, to improve the product, for which Cerner allegedly employs Google Analytics. *See* Compl. ¶ 123. But no facts Plaintiffs allege show that this information has independent value to them that Cerner should have shared, or that Cerner diminished. So this alleged basis for injury is insufficient. And again, the facts undermine any "benefit" to Cerner other than improvements to its patient portal platform—which benefit Plaintiffs, as users, as well. *See* Lowery Decl. ¶¶ 13, 20.

*Third*, Plaintiffs' claim that Cerner "eroded the essential confidential nature of the provider-patient relationship" does not demonstrate concrete harm. Compl. ¶ 12. Plaintiffs plead no facts nor provide any explanation concerning this erosion. They do not, for example, allege that they now trust their healthcare providers less than before Cerner allegedly used

Google Analytics on the patient portal. *See, e.g.*, Report & Recommendation, *Baker v. Akumin*, 2024 WL 1931480, at *7 (S.D. Fla. Apr. 16, 2024) ("erosion of the essential and confidential [provider-patient] relationship" was inadequately pleaded as an injury-in-fact where the plaintiff provided "no facts or explanation concerning this 'erosion'"). And Cerner is aware of no decision that has held that a third-party—i.e., not a healthcare services provider or healthcare facility—could be directly liable for eroding the confidential nature of the provider-patient relationship.

*Fourth*, for their ECPA and Missouri computer tampering claims, Plaintiffs claim that they "did not get the full value of the medical services for which they paid, which included their healthcare provider's duty to maintain confidentiality." Compl. ¶ 199. This too is insufficient. Plaintiffs do not allege that they paid Cerner for using patient portals, or that they bargained with Cerner for protection of their personal information. (They did neither.) *Cf. Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017) (plaintiff established standing where he alleged that "a portion of the fees paid in connection with his Scottrade account were used to meet Scottrade's contractual obligations to … protect his PII," and that "[w]hen Scottrade breached those obligations, [he] received brokerage services of lesser value"); *see also, e.g.*, *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 30 (D.D.C. 2014) (even an allegation like this is insufficient by itself). If Plaintiffs paid for nothing, they overpaid for nothing. *See Cox v. Valley Hope Ass'n*, 2016 WL 4680165, at *5 (W.D. Mo. Sept. 6, 2016) ("a party must allege they overpaid for something—either the core product or an ancillary security service—for which they had expressly bargained" to "establish[] an injury-in-fact based on [their] overpayment theory"). If they overpaid for their "medical services," Compl.

¶ 199, it was to their providers. That injury (baseless anyway) does not confer standing to sue Cerner.

## III. Plaintiffs Fail To Plausibly Allege Any Cause Of Action

Even if Plaintiffs had standing to sue, their claims against Cerner should still be dismissed because the Complaint does not plausibly allege any cause of action. On a motion to dismiss under Rule 12(b)(6), courts "construe the Complaint in favor of … the non-moving party, assuming well-pleaded facts are true, but … do not accept legal conclusions phrased as fact allegations." *Buckley v. Hennepin Cnty.*, 9 F.4th 757, 760 (8th Cir. 2021).

### A. Plaintiffs Fail To Plausibly Allege Any Claim Under The ECPA

Plaintiffs' four claims under the Electronic Communications Privacy Act (ECPA)[5] all fail as a matter of law for the same reason: they do not plausibly allege that Cerner intercepted or disclosed to Google the "contents" of any communications. This is required for each ECPA claim. *See* 18 U.S.C. § 2510(4) (defining "intercept" to mean "the aural or other acquisition of the *contents* of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" (emphasis added)); 18 U.S.C. § 2702 (prohibiting disclosure of "the *contents* of a communication while in electronic storage by that service" (emphasis added)).

"Contents" has a particular meaning under the ECPA. The statute defines "contents" as "information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). In other words, "the term 'contents' refers to the intended message conveyed by the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). It "does not

[5] As Plaintiffs style them, they are: Count I (Wiretap Interception), 18 U.S.C. § 2511(1); Count II (Wiretap Divulgence by an ECS Provider), 18 U.S.C. § 2511(3); Count III (Divulgence of Stored Communications Content by an ECS Provider), 18 U.S.C. § 2702(a)(1); and Count IV (Divulgence of Stored Communications Content by an RCS Provider), 18 U.S.C. § 2702(a).

include record information regarding the characteristics of the message that is generated in the course of the communication." *Id.* For instance, the words spoken on a phone call are its "contents," *id.*, while the "data collected by the telephone company about the source, destination, duration, and time of a call" are not, *United States v. Reed*, 575 F.3d 900, 916 (9th Cir. 2009). Courts in this circuit and elsewhere track this distinction. *See, e.g.*, *United States v. Dickerman*, 2017 WL 11485604, at *14 (E.D. Mo. Sept. 26, 2017) (an IP address, date, time, and key (the "hash value of the file") "do[] not appear" to be "'content' under the ECPA" as they "do[] not include information concerning the substance, purport or meaning of the communication"), *report & recommendation adopted*, 2018 WL 10228437 (E.D. Mo. Apr. 27, 2018), *aff'd*, 954 F.3d 1060 (8th Cir. 2020); *United States v. Hoeffener*, 2018 WL 2996317, at *12 (E.D. Mo. May 9, 2018) (an IP address and defendant's "torrent infohash" were "unlikely" to be "content" under the ECPA), *report & recommendation adopted*, 2018 WL 2981426 (E.D. Mo. June 13, 2018), *aff'd*, 950 F.3d 1037 (8th Cir. 2020); *see also Gilday v. Dubois*, 124 F.3d 277, 296 n.27 (1st Cir. 1997) ("[S]imply captur[ing] electronic signals relating to the PIN of the caller, the number called, and the date, time and length of the call" does not fall "within the ambit of the Federal Wiretap Act."); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 944-45 & n.9 (N.D. Cal. 2023) (concluding that seven out of the nine types of information allegedly captured were "record information that does not constitute 'content' under the ECPA," and despite a "lack of specificity" about whether collected URLs included "search terms which would *reveal the content a user searched for*," plaintiffs "pled *just barely enough* to withstand dismissal" on the pleadings alone, under Ninth Circuit caselaw, because of the alleged transmission of health "data entered into forms" (first emphasis added)).

Plaintiffs do not plausibly allege facts showing that Cerner intercepted or disclosed communication "contents." They allege that their "actions" were shared with Google—"*Actions* to log-in to Patient Portals"; "*Actions* to Sign Up for Patient Portals"; "*Actions* to log-out of Patient Portals"; "*Actions* taken inside Patient Portals"; "Any *actions* that patients take on their healthcare providers' properties while logged-in to Patient Portals, including searching or exchanging communications about a specific doctor, condition, or treatment." Compl. ¶ 50 (emphases added). Plaintiffs' "actions" are not content. For example, Plaintiffs allege that when they click a link within the portal, the URL of the link is shared with Google via Google Analytics. *See, e.g.*, *id.* ¶ 51 (alleged "[w]hen patients interacted with its Patient Portals, Cerner disclosed a full-string, detailed URL to Google"; "[f]or example, when a patient clicks on a link to view a specific test result or make an appointment with a specific physician, Google receives the precise text of the patients' query"). That a patient "clicks on a link" to view a test result or schedule an appointment does not convey the contents of the test result or the conversation with the physician. Indeed, no more is disclosed from that action than by a patient's checking in at LabCorp or walking into a doctor's office. No doubt there is "content" on Plaintiffs' patient portal, *see, e.g.*, *id.* ¶ 185 (alleging some content, some non-content), but Plaintiffs do not—and could not—allege that any content was disclosed to Google by Cerner's using Google Analytics. On a motion to dismiss, the Court does not credit Plaintiffs' characterizations of their allegations that strain credulity—such as that disclosures included the "precise text," or "exact contents" of "patients' communications with their treating physicians," *e.g.*, Compl. ¶¶ 53-54, 267—when the *facts* that they allege do not fit the bill. *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) ("While the court must accept allegations of fact as true when considering a

motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.”).

### B. Plaintiffs Fail To Allege Tampering With Computer Data In Violation of Mo. Rev. Stat. §§ 569.095 & 537.525

Plaintiffs fail to state a claim under the Missouri Computer Tampering Act (“MCTA”), Mo. Rev. Stat. §§ 569.095, 537.525; Compl. ¶¶ 260, 264. “Under the MCTA, a person commits the crime of computer tampering if he ‘knowingly and without authorization or without reasonable grounds to believe that he has such authorization, … [d]iscloses or takes data[.]” *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 843 (8th Cir. 2015) (quoting Mo. Rev. Stat. § 569.095); *see also Consultus, LLC v. CPC Commodities*, 2022 WL 345653, at *4 (W.D. Mo. Feb. 4, 2022) (“[C]omputer tampering must be done ‘without authorization or without reasonable grounds to believe that he has such authorization.”).

Plaintiffs premise their MCTA claim on Cerner’s alleged disclosure of their “Health Information,” including their “status as patients, and the exact contents of communications exchanged … with their healthcare providers.” Compl. ¶¶ 264-67. But as already explained, Plaintiffs have not plausibly alleged that Cerner disclosed any such information to Google. At most, Plaintiffs have alleged that Cerner disclosed information regarding the “actions” they took on the patient portal—none of which is plausibly alleged to personally identify Plaintiffs or the specifics of their medical history—for purposes of analyzing and enhancing patients’ user experience on the patient portal. *See supra* pp. 10-12. As to *this* information, Plaintiffs have not plausibly alleged that Cerner lacked reasonable grounds to believe it had authorization to disclose it. To the contrary, Plaintiffs elsewhere allege that Cerner *told* patients that it would collect and use such “de-identified” “Site usage information.” Compl. ¶ 311. Plaintiffs’ implausibly pled MCTA claim should be dismissed, as courts have held elsewhere in interpreting

similar state computer crime statutes. *See, e.g.*, *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 132 (N.D. Cal. 2020) (dismissing California Computer Crime Law claim with prejudice because the second amended complaint again failed to sufficiently allege that defendant acted "knowingly and without permission" and "merely parrot[ed] the language of the CCCL"); *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1176-77 (D. Nev. 2021) (dismissing Nevada Computer Crime Law claim because complaint failed to sufficiently allege that the alleged conduct was done "without authorization").

### C. Plaintiffs Fail To Allege Intrusion Upon The Seclusion Of Another

The tort of intrusion upon seclusion "consists solely of an intentional interference with [one's] interest in solitude or seclusion"—not the "publicity given to the person whose interest is invaded or to his affairs." Restatement (Second) of Torts § 652B cmt. a (1977). Plaintiffs do not allege Cerner interfered with their privacy. Instead, they focus on the alleged "publicity" of their information, namely that Cerner disclosed their properly obtained information to Google by using Google Analytics. Courts, including those applying Missouri law, routinely reject this type of claim for intrusion on seclusion. *See, e.g.*, *St. Anthony's Med. Ctr.*, 974 S.W.2d at 610 ("Publishing [properly obtained] private information is not an element of unreasonable intrusion upon seclusion."); *In re Trans Union Corp., Priv. Litig.*, 326 F. Supp. 2d 893, 901 (N.D. Ill. 2004) ("[I]t is the intrusion itself that creates liability, not any subsequent publication or disclosure."); *Hill v. MCI WorldCom Commc'ns, Inc.*, 141 F. Supp. 2d 1205, 1210 (S.D. Iowa 2001) (the "disclosure of properly obtained information does not state a claim for invasion of privacy under the theory of intrusion upon seclusion"); *Peterson v. Moldofsky*, 2009 WL 3126229, at *3 (D. Kan. Sept. 29, 2009) (same) (collecting cases).

Plaintiffs also fail to plead facts showing that Cerner obtained private information "through some method objectionable to the reasonable person." *Ruzicka Elec. & Sons, Inc. v.*

*Int'l Bhd. of Elec. Workers, Loc. 1, AFL-CIO*, 427 F.3d 511, 524 (8th Cir. 2005) (quoting *Corcoran v. Sw. Bell Tel. Co.*, 572 S.W.2d 212, 215 (Mo. Ct. App. 1978)). They allege Cerner obtained information in the ordinary course of its business providing patient portals to healthcare providers. *See* Compl. ¶¶ 2-3, 26-28. Cerner's ordinary course of business is not objectively unreasonable, as a matter of law. *See Petri v. Valarity, LLC*, 2015 WL 7253061, at *2 (E.D. Mo. Nov. 17, 2015) ("[A] plaintiff cannot establish the defendant's use of 'unreasonable means' to obtain information if a defendant obtains such information in the ordinary course of business." (quoting *Thomas v. Corwin*, 483 F.3d 516, 532 (8th Cir. 2007))). In analogous circumstances, the Missouri Court of Appeals rejected an intrusion-on-seclusion claim where a patient sued a hospital for allegedly releasing medical records because the hospital obtained the records in its ordinary course of business, not in an objectively unreasonable manner. *See St. Anthony's Med. Ctr.*, 974 S.W.2d at 610. The Court should do the same here.

### D. Plaintiffs Fail To Allege Identity Theft

Plaintiffs fail to state a claim that Cerner has committed the criminal act of identity theft. "A person commits the offense of identity theft if he or she knowingly and with the intent to deceive or defraud obtains, possesses, transfers, uses, or attempts to obtain, transfer or use, one or more means of identification not lawfully issued for his or her use." Mo. Rev. Stat. § 570.223. Plaintiffs fail to state the crime of identity theft by Cerner for at least two reasons.

*First*, Cerner is a company and "only a 'person' can be held liable for identity theft in Missouri." *Smith v. Curators of Univ. of Mo.*, 2017 WL 11492763, at *7 (W.D. Mo. Dec. 20, 2017) (interpreting "person" in favor of defendant under the rule of lenity because Section 750.223 "is primarily a criminal statute to punish identity fraud," and dismissing identity theft claim against a "corporate bodies politic").

*Second*, like intrusion-on-seclusion, identity theft does not apply where, as here, someone had "a permissible purpose or had reason to believe it had a permissible purpose." *Morris v. Northland Grp., Inc.*, 2016 WL 3562144, at *4 (W.D. Mo. June 24, 2016). If so, there is no plausible "intent to deceive or defraud." Mo. Rev. Stat. § 570.223. As alleged, Cerner had an ordinary business purpose for obtaining information from Plaintiffs and sharing the limited information about their use of its patient portals with Google. *See* Compl. ¶¶ 113 (alleging Cerner acted "in order to gain access to the benefits of Google Analytics"), 123 (Cerner "used the analytics data that it received from Google to enhance the patient portal product"). Such allegations fail to state an identity-theft claim as a matter of law. *See Morris*, 2016 WL 3562144, at *4 (granting summary judgment because defendant "had a permissible purpose or had reason to believe it had a permissible purpose … to obtain Plaintiff's credit report"); *Campbell v. Accts. Receivable Mgmt., Inc.*, 2015 WL 4425823, at *5 (W.D. Mo. July 20, 2015) (granting summary judgment because defendant lacked "the requisite scienter when it accessed the reports … solely to gather information to collect upon a debt owed to" it).

### E. Plaintiffs Fail To Allege Unjust Enrichment

Plaintiffs' allegations do not plausibly amount to unjust enrichment. This quasi-contract remedy applies when someone confers a benefit on someone else, who then unjustly retains it. *See, e.g.*, *Hennessey v. Gap, Inc.*, 86 F.4th 823, 830-831 (8th Cir. 2023) ("Under Missouri law, a claim for unjust enrichment requires the plaintiff to plead and prove three elements, 'a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of that benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable.'"). Under the complaint's well-pleaded facts, Cerner cannot be said to have unjustly retained any benefit from Plaintiffs. *See Roberts v. Roberts*, 580 S.W.3d

600, 605 (Mo. Ct. App. 2019) ("'Even if a benefit is conferred and appreciated, if no injustice results from the retention of the benefit, then no cause of action for unjust enrichment will lie.'" (quoting *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 216 (Mo. Ct. App. 2013))). Plaintiffs state they used the patient portals to "manage their healthcare online." Compl. ¶ 2. They allege that Cerner retained access to their portal-usage activity, which it analyzed with Google Analytics in order "to enhance the patient portal product." *Id.* ¶ 123. No injustice to Plaintiffs plausibly resulted. To claim unjust enrichment here is like saying a shopkeeper who noticed customers eyeing items at the back of the store and therefore moved the items out front was "unjustly enriched" by those customers. In any event, Plaintiffs' unjust enrichment claim has no connection to Plaintiffs' alleged injury: *Google*'s access to Plaintiffs' portal usage information. Courts regularly dismiss unjust enrichment claims from these sorts of data-sharing lawsuits, as this Court should. *See, e.g.*, *Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 852 (N.D. Ill. 2024); *In re NCB Mgmt. Servs., Inc. Data Breach Litig.*, 748 F. Supp. 3d 262, 277-279 (E.D. Pa. 2024); *In re Amer. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *18 (D.N.J. Dec. 16, 2021).

## IV. IF THE COURT DISMISSES THE COMPLAINT UNDER RULE 12(b)(6), IT SHOULD BE DISMISSED WITH PREJUDICE

Under Rule 12(b)(6), the Court should dismiss Plaintiffs' claims with prejudice. The complaint functionally serves as an amended version of Plaintiffs' counsel's pleadings in the Federal *Maryland* action—with the benefit of completed motion-to-dismiss and preliminary-injunction briefing, and with the benefit of full discovery in the State *MedStar* action. The actions initiated by Plaintiffs' counsel feature the same factual allegation at their core: that Cerner used Google Analytics to analyze how people used its patient portals, which necessarily required sharing that usage information with Google. But, as demonstrated above, this allegation

does not amount to an Article III injury or support a claim under any of Plaintiffs' cause of action. No amendment can change that inescapable conclusion, and dismissal with prejudice is appropriate. *See Wright v. Anthony*, 733 F.2d 575, 577 (8th Cir. 1984) (dismissal with prejudice is proper when "the complaint on its face shows that no cause of action can be stated against defendants and that a dismissal with leave to amend would serve no useful purpose"); *see also Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 446 (8th Cir. 2014) (same).

Dismissal with prejudice would be consistent with the landscape of "pixel" ligation nationwide. Courts across the country have routinely dismissed similar claims when the complaint failed to allege the disclosure of substantive health or treatment information specific to the individuals. *See, e.g.*, *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 843 (N.D. Ill. 2023) (dismissing Plaintiffs' counsel's complaint because, despite amendment, the "allegations are far too vague to allow an inference to be drawn that [defendant] was actually disclosing [individually identifiable health information] as it is unambiguously defined by HIPAA, rather than just metadata"); *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734, at *3 (E.D. Pa. Oct. 10, 2023) (dismissing complaint that failed to allege "that any specific test results, diagnoses, or sensitive messages were intercepted or improperly disclosed … [or] offer more detailed descriptions of the communications and information [allegedly] intercepted."); *J.C. v. Catholic Health Sys. Inc.*, 2024 WL 5136236, at *10 (W.D.N.Y. Aug. 29, 2024) ("I find that plaintiff's allegations lack the necessary specificity to allege an ECPA violation because they are not specific enough to allow an inference that defendant was transmitting IIHI to third parties.") *report & recommendation adopted*, 2025 WL 351043 (W.D.N.Y. Jan. 31, 2025); *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 849 (N.D. Cal. 2024) (dismissing Plaintiffs' counsel's complaint, which the court described as "incredibly long … difficult to follow, not to mention

self-contradictory," where "the most important allegations were conclusory," and holding that "[i]t would be reasonable, considering the number of chances … given, to dismiss the complaint with prejudice").

In contrast, similar claims have survived only when pleaded alongside substantive and specific allegations about the actual information transmitted to and used by third parties. *See, e.g.*, *Kurowski v. Rush Sys. for Health*, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (permitting Plaintiffs' counsel to file an amended complaint, which contained additional allegations that the data transmitted included "the name and location of her personal physician as well her physician's specialty," which "was, in turn, used by at least Facebook to target her with particular advertising associated with her particular health conditions"). As explained, Plaintiffs do not plausibly allege facts showing that Cerner intercepted or disclosed communication "contents" to third parties, nor—unsurprisingly—that Plaintiffs ever received any targeted marketing related to their personal health information.

Plaintiffs' counsel—in their third attempt to bring a class action lawsuit over the use of Google Analytics on Cerner's patient portals—filed an amended complaint in a different jurisdiction that continues to fall well short of the specific allegations required by courts across the country to support similar claims related to disclosures of personal health information via the use of a website analytics and performance tool. Their failure confirms the futility of any further amendments.

## CONCLUSION

This Court should dismiss or transfer this case under the first-filed rule; dismiss it for lack of subject-matter jurisdiction under Rule 12(b)(1); or dismiss all of Plaintiffs' claims against Cerner with prejudice under Rule 12(b)(6).

Dated: September 12, 2025

Respectfully submitted,

/s/ *Alan Schoenfeld*
Alan Schoenfeld (*pro hac vice*)
Ryan Chabot (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 937-7294
alan.schoenfeld@wilmerhale.com
ryan.chabot@wilmerhale.com

Patrick Fanning – MO Bar # 47615
LATHROP GPM LLP
2345 Grand Blvd., Suite 2200
Kansas City, Missouri 64108
(816) 460-5416
patrick.fanning@lathropgpm.com

*Attorneys for Defendant Cerner Corporation*

**CERTIFICATE OF SERVICE**

I certify that on September 12, 2025, this document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Alan Schoenfeld*
Alan Schoenfeld

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the page limitations established by this Court's September 9, 2025 Order granting the parties' Joint Motion for Leave to Exceed Page Limit for Suggestions in Support and Opposition to Motion to Dismiss. *See* Dkts. 18-19. Exclusive of the Statement of Fact, signature blocks, and Certificate of Service, this brief is 19 pages. *See* Civil Local Rule 7.0(d)(2) (excluding "exhibits, signature blocks, certificates of service, and statements of fact" from applicable page limitations).

*/s/ Alan Schoenfeld*
Alan Schoenfeld

September 12, 2025