**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| GARY WHITBY and JEREMY PAQUETTE, Plaintiffs, | ) | |
| v. | ) | No. 25-04087-CV-C-BP |
| CERNER CORP., Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Defendant Cerner Corp. ("Cerner") designs computer and information systems for healthcare providers, including "patient portals" that provide patients with online access to their medical providers' systems. Portals permit patients to (for instance) make appointments, pay bills, and review their medical information. Plaintiffs' Amended Complaint advances several federal and state claims based on their allegation that Cerner-designed patient portals divulge information about patients to Google.[1] Cerner filed a Motion to Dismiss, arguing (1) the first-filed rule required dismissal of the case, (2) Plaintiffs lack standing, and (3) Plaintiffs have failed to state a claim for which relief can be granted. The Court issued an Order that denied the Motion to Dismiss to the extent it argued for dismissal based on the first-filed rule and directed the parties to supplement their argument regarding standing (the "Prior Order"). (Doc. 39.) The Court has reviewed the parties' submissions and now concludes the Motion to Dismiss, (Doc. 20), should be **GRANTED**. Counts I through V and VIII are dismissed without prejudice for lack of jurisdiction and Counts VI and VII are dismissed with prejudice for failure to state a claim.

[1] The Amended Complaint specifies the information was divulged to Google and does not allege Cerner divulged the information to any other third parties.

## I. BACKGROUND[2]

The Amended Complaint alleges that the patient portals Cerner designed utilize "Google Analytics," which is a web tracking technology.[3] This technology collects information from a computer accessing a website, including the computer's IP address, the URLs visited, and information transmitted by "cookies." In summary:

- An IP address is a number that is assigned to devices connected to the internet.
- A URL is a web address for a particular website, or page on a website.
- Cookies are files or programs that are downloaded onto a computer, typically by a website.
- "First party cookies" are put on a user's device by the website with which it is exchanging information.
- "Third party cookies" are put on a user's device by websites other than the one with which the user is exchanging information.

While Cerner used the information gathered by Google Analytics for purposes related to the portal's operation, optimization, and the like, (*e.g.*, Doc. 14, ¶ 123), Plaintiffs allege the information was also conveyed to Google. Plaintiffs have broadly characterized the information Cerner transmitted to Google as "health information." However, as the Prior Order observed, the Amended Complaint does not contain "a discrete set of allegations that specifically describe the information Plaintiffs allege Cerner made available to Google, and the paragraphs the Court has identified as potentially describing the information are vague and contradictory." (Doc. 39, p. 11.) Moreover, some of the Amended Complaint's allegations define or use the phrase very broadly,

[2] All page numbers for documents filed with the Court are those generated by the CM/ECF system.

[3] Cerner represents that it began limiting the information transmitted to Google via Google Analytics in 2017 and stopped using Google Analytics in 2023. (*E.g.*, Doc. 21-1, ¶¶ 8, 17, 28-29; Doc. 21-2, ¶¶ 7, 16, 25-26.) Plaintiffs do not dispute Cerner's representations; nonetheless, they played no part in the Court's analysis.

while others were very narrow. The Court listed some examples, then observed "there may be legally important differences between conveying (1) the fact that a patient accessed the patient portal, (2) the fact that a patient requested *a* test, (3) the fact that a patient requested a particular test, and (4) the results of a particular test." (Doc. 39, p. 13 (emphasis in original).) The Court then directed Plaintiffs

> to file a Supplemental Brief that specifies the information they allege Cerner divulged to Google. *They need to be as specific as possible . . . . They must also identify the Amended Complaint's paragraphs that allege these facts.* Finally, they must explain why divulging the information they have specified constitutes a concrete injury; in so doing, they must explain why the harm they allege is sufficiently close to a harm protected in common law to permit the conclusion that their harm constitutes an Article III injury.

(Doc. 39, p. 13 (emphasis supplied).)

With their response, Plaintiffs submitted an Affidavit (the "Affidavit") from Zubair Shafiq, a professor of computer science at the University of California-Davis. (Doc. 40-1.) The Court allowed Plaintiffs to file the Affidavit over Cerner's objection because it clarifies certain computer terms and aids in understanding the Amended Complaint's allegations which, as noted above, are inconsistent and at times contradictory. The Court has considered the Affidavit (and may cite it herein) from this perspective. The Court is not making findings of fact or otherwise determining the truth of any allegations in the Amended Complaint or the Affidavit.

Cerner's use of Google Analytics results in certain information about what patients do in the portal being conveyed to Google. Information conveyed to Google includes (1) the user's IP address, (2) the URLs for the webpages visited by the user, and (3) functions accessed or types of information sought (such as paying a bill, making an appointment, searching for a doctor, or reviewing a test result). (*E.g.*, Doc. 14, ¶¶ 9, 36, 49-50, 64-67, 69.) Accumulation and analysis of this information would permit Google to infer information about persons accessing the portal, who

are identified only by their device's IP address and a unique numeric code assigned by the portal (which is also conveyed to Google). (*E.g.*, Doc. 14, ¶ 112; Doc. 40-1, ¶ 50.) Moreover, if the patient uses other services provided by Google (such as Gmail or YouTube), Google can link information from those services to further identify the patient. (*E.g.*, Doc. 14, ¶¶ 70, 114; Doc. 40-1, ¶¶ 52-53, 55.) As the Affidavit explains, it "is functionally similar to observing a patient's movements and requests inside a hospital" that "allows an external observer to reconstruct potentially sensitive aspects of the patient's medical journey." (Doc. 40-1, ¶¶ 64, 66.) In short, Plaintiffs allege the information conveyed to Google could be analyzed and assembled to infer health information about each user.

But critically, in their Supplemental Brief Plaintiffs do not claim they are alleging that the information conveyed to Google includes a patient's name, or any diagnoses, test results, prescribed treatment, or similar health information. (*See* Doc. 41, pp. 2-4.) Thus, in the form it is provided to Google, the data does not constitute information about a particular person's health condition, diagnosis, or treatment. Moreover, while Plaintiffs allege the information conveyed can be combined and analyzed to permit inferences to be drawn about patients, they do not allege that Google (or anyone) conducts this analysis. To the contrary, Plaintiffs allege facts suggesting that Google is not interested in making these inferences, as demonstrated by allegations that Google warns customers (such as Defendant) not to utilize Google Analytics on web pages involving health matters. (*E.g.*, Doc. 14, ¶¶ 7, 80, 84.) In fact, Google prohibits the use of Google Analytics on such pages. (Doc. 14, ¶ 84.) Thus, the information allegedly conveyed must be pieced together, analyzed, and combined with other data before any inferences about a particular person can be discerned—but Plaintiffs do not allege this occurred.[4]

---

[4] The Affidavit similarly does not state the information conveyed to Google includes a patient's name or actual health information; it consistently discusses the potential for analyzing the data to infer such information. And, like the

The Court acknowledges, as it did when it directed Plaintiffs to clarify their claims, that some allegations in the Amended Complaint suggest a broader characterization of the information conveyed to Google. For instance, the Amended Complaint alleges:

- Cerner disclosed "Plaintiffs' . . . requests for and receipt of medical treatment, including their review of lab and test results, medications, appointments, and communications with their treating physicians." (Doc. 14, ¶ 36(c).)
- "Google receives the precise text of communications that Plaintiffs . . . made about specific medical providers, treatments, conditions, appointments, tests, medications, payments, and registrations." (Doc. 14, ¶ 53.)
- "Google obtain[ed] a comprehensive history of" patients. (Doc. 14, ¶ 55.)
- "Google received the exact contents of patients' communications . . . ." (Doc. 14, ¶ 57.)

However, Plaintiffs did not cite these paragraphs (or any like them) in response to the Court's directive to identify the Amended Complaint's paragraphs supporting their asserted injuries. Instead, they cited paragraphs that corresponded to the Affidavit's narrower explanation. (Doc. 41, pp. 2-3 (citing Doc. 14, ¶¶ 49-50, 65).) Thus, when specifically asked to clarify inconsistencies in the Amended Complaint and cite the paragraphs supporting the existence of an Article III injury, they (1) provided an Affidavit explaining a theory of injuries, (2) cited paragraphs from the Amended Complaint consistent with the Affidavit's explanation, and (3) did not cite paragraphs that might have alleged a broader scope of information was provided to Google. Given the procedural history, the Prior Order, and Plaintiffs' response, the Court concludes Plaintiffs have abandoned any allegations that might have suggested a broader definition of "health

---

Amended Complaint, the Affidavit does not suggest Google engaged in this analysis. Thus, to the extent the Affidavit explains Plaintiffs' theories, it also does not support an expansive interpretation.

information." *See, e.g.*, *Rostkoff v. Cooley*, 438 F.3d 852, 854-55 (8th Cir. 2006) (deeming abandonment to have occurred when a party "fail[ed] to provide any reasons or arguments for his contentions." (quotation omitted)).

With this understanding in place, the Court can proceed to analyze the remaining issues.

## II. DISCUSSION

Plaintiffs assert eight claims: six are statutory and two are common law claims. The claims are:

| | |
|---|---|
| Count I | Violation of 18 U.S.C. § 2511(1)—the Electronic Communications Privacy Act, |
| Count II | Violation of 18 U.S.C. § 2511(3)—another provision of the Electronic Communications Privacy Act, |
| Count III | Violation of 18 U.S.C. § 2702(a)(1)—the Stored Communications Act, |
| Count IV | Violation of 18 U.S.C. § 2702(a)(2)—another provision of the Stored Communications Act, |
| Count V | Tampering with computer data, in violation of §§ 537.525 and 569.095 of the Revised Statutes of Missouri, |
| Count VI | Unjust enrichment/quantum meruit, |
| Count VII | Invasion of privacy, and |
| Count VIII | Identity theft, in violation of § 570.223 of the Revised Statutes of Missouri. |

As discussed more fully below, the Court concludes Plaintiffs lack standing to assert their statutory claims, and the remaining counts (Counts VI and VII) should be dismissed for failure to state a claim.

## A. Standing

"[T]he irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation omitted). Cerner focuses on the first requirement, and the Court will do so as well.

When resolving a motion seeking dismissal based on a lack of jurisdiction, the Court "must distinguish between a 'facial attack' and a 'factual attack' on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quotation omitted). A factual attack asks the Court to consider facts outside the Complaint and its attachments, *id.*, and Cerner has supplied affidavits for the Court to consider. However, Cerner asks the Court to (1) rely on its affidavits to make factual findings about what kind of information was received by Google, then (2) conclude sending that kind of information to Google does not constitute an injury recognized by Article III. But "what the defendant actually did" is a question intertwined with the merits, and when resolving standing the Court must not "conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). In other words, when evaluating whether the plaintiff suffered an injury, the Court cannot evaluate facts submitted in an affidavit, determine the defendant did not engage in the alleged (mis)conduct, and conclude the defendant caused no harm. Holding otherwise would permit every defendant that denies wrongdoing to seek an early judicial determination regarding its actions and, if the judge determines it did not act in the manner alleged by the plaintiff, obtain a dismissal without prejudice. What Cerner asks for is, in substance, a resolution of the merits, which the Court cannot conduct. Thus, when evaluating whether Plaintiffs

have suffered an injury, the Court confines itself to the Amended Complaint and the Affidavit (which is used to explain and clarify, not to prove, the Amended Complaint's allegations).

"An injury in fact must be actual or imminent and must also be concrete and particularized." *E.g.*, *Spokeo*, 578 U.S. at 339. In the context of a statutory claim, the fact that the legislature has created a cause of action a plaintiff may invoke is not, alone, sufficient to constitute a concrete injury. *E.g.*, *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544-45 (2020). "[A]n important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426-27 (2021).[5] A concrete injury "must actually exist," but it need not necessarily be tangible; "[a]lthough tangible injuries are perhaps easier to recognize . . . intangible injuries can nevertheless be concrete." *Spokeo*, 578 U.S. at 340. Plaintiffs do not claim they have standing due to a tangible injury (such as the loss of money or personal injury); they primarily focus on the disclosure of what they describe as private information and argue that the violation of such privacy interests support standing. The Court must determine if the injury they have described is sufficient for Article III purposes.

> In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles. Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.

[5] While *Spokeo* and *TransUnion* discuss federal statutes, the analysis they require also applies to claims based on state statutes. "It would be an anomaly if a state legislature could grant [a] plaintiff the keys to federal court based on a mere statutory violation when Congress can't." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 243 n.1 (4th Cir. 2023); *see also Castro v. PPG Indus., Inc.*, 2022 WL 3681305, at *1 (9th Cir. Aug. 25, 2022); *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1002-03 (11th Cir. 2016).

*Spokeo*, 578 U.S. at 340-41. Plaintiffs' claims need not precisely match a common law *claim*; the question is whether the alleged *injury* is close to one that would support a common law claim. "In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, we do not require an exact duplicate." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 433 (2021); *see also*, *e.g.*, *Gallagher v. Santander Consumer USA, Inc.*, 125 F.4th 865, 868 (8th Cir. 2025); *Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1136-37 (8th Cir. 2023). And with respect to Congress's role, it "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo*, 578 U.S. at 341 (quotation omitted); *see also* *TransUnion*, 594 U.S. at 425-26.

Here, Plaintiffs compare the harm they allegedly suffered to the harm protected by common law torts designed to protect privacy and specifically cite the tort for intrusion upon seclusion. "[H]arms traditionally recognized as providing a basis for lawsuits in American courts . . . include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425 (citation omitted). Disclosure of a person's medical records, diagnoses, medications, or the like are harms protected by such torts. *See*, *e.g.*, *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 423 (4th Cir. 2025); *Smith v. Loyola Univ. Med. Ctr.*, 2024 WL 3338941, at *4 (N.D. Ill. July 9, 2024). But, "[t]hough it is true that the kind of harm to privacy associated with an intrusion upon seclusion can constitute a concrete injury for standing purposes, that doesn't mean that every plaintiff who comes to court alleging such a harm gets in the courthouse door." *Jones v. Bloomingdales.com, LLC*, 124 F.4th 535, 539 (8th Cir. 2024). And here, divulging the type of information Plaintiffs allege was conveyed is not a harm protected by the common law. The information allegedly conveyed is similar to what might be obtained by watching a person

while in a medical facility's waiting room: for instance, the fact that they went to a particular health care facility (but not which doctor), ordered a test (but not which one), reviewed a test (but not the results), or ordered medication (but not the contents of the order). (*See* Doc. 40-1, ¶¶ 64, 66.) In an ordinary business setting, where similar information is gleaned or conveyed from a retailer's website, this is insufficient to establish an injury. *See Jones*, 124 F.4th at 539.

Plaintiffs attempt to avoid *Jones*'s holding—and raise the privacy interests at stake—by characterizing the information as "health information," which is a distinction *Jones* itself recognized as significant. *Id*. But as explained above, "health information," as that term is commonly understood, was not conveyed. No diagnoses, prescriptions, test results, assessments, or medical complaints were reported, but this is the type of information the common law protects against disclosure. Labeling it "health information" does not make it so. Plaintiffs also rely on the fact that the conveyed data could be analyzed to extrapolate information that is protected in common law. However, even if extrapolating "health information" from "non-health information" could itself constitute an injury,[6] Plaintiffs do not allege that such extrapolation occurred or is likely to occur. These observations—that the information is not (1) itself protected in common law or (2) used or likely to be used to derive information protected in common law—differentiates this case from those upon which Plaintiffs rely.[7]

---

[6] In this regard, it is not even clear that the inferences Plaintiffs allege can be created constitute "health information;" the Affidavit's description of the possible inferences that can be drawn seems more limited. (*See* Doc. 40-1, ¶¶ 61-64.) Nonetheless, for the sake of argument the Court will assume the information that can be inferred from the data transmitted qualifies as "health information"—but as discussed in the text, this (1) doesn't mean the information originally provided to Google qualifies as health information and (2) does not establish that Google (or anyone) analyzed the information to make inferences about individuals' health information.

[7] For instance, in *In re Meta Pixel Healthcare Litig.*, after holding an evidentiary hearing on the plaintiffs' request for injunctive relief, the district court found that the information conveyed "include[ed] information about doctors, *medical conditions*, and appointments associated with a patient's session" on the portal, and there were allegations the information was monetized because it was used to generate targeted advertising. 647 F. Supp.3d 778, 785 (N.D. Cal. 2022) (emphasis supplied). Plaintiffs cite other cases that, like *Meta Pixel*, are also based on the use of Meta's technology, and they similarly allege—in contrast to the allegations here—that the information conveyed included the patients' medical conditions, symptoms, and treatment, and that it was used to generate targeted advertising. *E.g.*,

Thus, Plaintiffs' allegation that Cerner conveyed to Google information chronicling the activities of what patients' computers did on the patient portals is insufficient to establish an injury. The computers are identified only by IP address; no names or other personal identification information were provided. The activities reported consist of pages viewed and buttons clicked—but no actual medical information was conveyed. Cerner's provision of this much information did not cause any harm that is sufficiently close to one protected under common law to give Plaintiffs standing. And, to the extent that Plaintiffs claim Google *could* use the information to cause harm—that is, that Google could use the information to (1) identify specific individuals and (2) make inferences about matters related to their health, they do not allege that it has happened and they have not alleged facts suggesting (or otherwise argued) that such events are imminent. *E.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." (quotation omitted)). This observation is particularly relevant in the context of alleged harms arising from dissemination of information. When (as has been established above) disclosure of the information itself is not an injury, the plaintiff must allegation either (1) misuse or (2) a substantial risk of future misuse. *E.g.*, *In re SuperValu, Inc.*, 870 F.3d 763, 769-71 (8th Cir. 2017). In *Supervalu*, the plaintiffs asserted various claims against a retailer arising from a data breach that allowed cybercriminals access to their credit card information. Obviously, there is nothing inherently private about a credit card number; therefore, the plaintiffs were required to plead that they had either suffered an injury or that there was a substantial risk they would suffer one in the future. Most of the plaintiffs relied on an injury based on the future risk of identity theft; however,

---

*J.C. v. Catholic Health Sys. Inc.*, 2024 WL 5136236, at *1 (W.D.N.Y. Aug. 20, 2024); *Smith v. Loyola Univ. Med. Ctr.*, 2024 WL 3338941, at *1 (N.D. Ill. July 9, 2024); *Doe v. Tenet Healthcare Corp.*, 731 F. Supp.3d 142 (D. Mass. 2024). In other cases cited by Plaintiffs, it is not clear what kind of information was conveyed. *E.g.*, *Frasco v. Flo Health, Inc.*, 2022 WL 21794391, at *1 (N.D. Cal. June 6, 2022).

the Eighth Circuit held that while "a complaint could plausibly plead that the theft of a plaintiff's personal or financial information creates a substantial risk that they will suffer identity theft sufficient to constitute a threatened injury in fact . . . plaintiffs ha[d] not done so[.]" *Id*. at 770.[8] Similarly, Plaintiffs have not alleged that Google has "misused" (or that there is a substantial risk that it will misuse) the non-private information it has received by using it to ascertain private information about them.

In their Supplemental Brief, Plaintiffs discuss three additional common law analogs, but these are insufficient as well. First, they compare the harm they have suffered to one protected by a claim for breach of fiduciary duty. "[A] physician has a fiduciary duty of confidentiality not to disclose any medical information received in connection with his treatment of the patient." *Brandt v. Medical Def. Assocs.*, 856 S.W.2d 667, 670 (Mo. 1993) (en banc). Assuming breach of fiduciary can serve as a common law analog to demonstrate Article III injuries caused by non-fiduciaries (here, Cerner), the theory does not aid Plaintiffs because, for the reasons discussed above, the information at issue is not "medical information." Next, Plaintiffs point to the harms protected by a claim for unjust enrichment. However, as will be explained in Part II.B.1, below, Plaintiffs have not sufficiently alleged Plaintiffs bestowed a benefit that is close to one protectible by a claim for unjust enrichment.

Lastly, Plaintiffs point to property-related harms protected by the torts of conversion and trespass to chattels. "Generally speaking, conversion is any distinct act of dominion wrongfully exerted over one's property, in denial of his right or inconsistent with it." *Aldridge v. Francis*, 503

[8] One plaintiff, who asserted a fraudulent charge had been posted to his account, was deemed to have suffered an injury. *Id*. at 772. However, those plaintiffs who had not had an unauthorized charge were not likely to have one in the future because they were able to cancel their credit cards. Thus, those plaintiffs alleged their injury was the risk their information would be used for identity theft.

S.W.3d 314, 317 (Mo. Ct. App. 2016). "Although the case law concerning [trespass to chattels] is sparse, [it] involves intentional conduct on the part of one person which interferes with the use of personal property in the possession of another without justification." *Foremost Ins. Co. v. Pub. Serv. Comm'n of Missouri*, 985 S.W.2d 793, 796-97 (Mo. Ct. App. 1998); *see also Tubbs v. Delk*, 932 S.W.2d 454, 456-57 (Mo. Ct. App. 1996). Thus, both torts involve interference with a person's property interest; here, the property interest Plaintiffs rely on is their computer (as opposed to the information discussed above), as explained in their Supplemental Brief:

> Plaintiffs allege Cerner surreptitiously placed Google tracking cookies on Plaintiffs' personal devices that were disguised as its own, evading privacy measures and commandeering Plaintiffs' devices to transmit information to Google without consent. FAC ¶¶ 43–45, 48. This conduct constitutes intermeddling with Plaintiffs' devices and information, closely resembling traditional property torts of trespass to chattel and conversion.

(Doc. 41, p. 9.)[9] The Affidavit provides further technical explanation: "third parties can also set disguised first-party cookies, a practice known as 'cookie ghostwriting.' These disguised first-party cookies allow entities to track users even when the user has blocked third-party cookies. A recent research study revealed that Google is the most pervasive cookie ghostwriter." (Doc. 40-1, ¶ 18.) But this explanation is inconsistent with Plaintiffs' allegations: according to the Affidavit, their theory for a property-related harm depends on the fact that *Google* disguises its cookies as first-party cookies, but they have sued Cerner and not Google. Regardless, to the extent they allege Cerner is responsible for cookie ghostwriting, they provide no authority or analysis supporting their conclusion that a website developer's (1) placement of cookies that (2) transmits information about the computer owner's use of the website is the sort of harm protected by these property-related torts. They only assert that "[c]ourts in this District have applied trespass to chattels to

[9] To place this statement in proper context, it must be remembered that Cerner arranged for itself to receive the information so it could "use the analytics data . . . to enhance the patient portal product . . . ." (Doc. 14, ¶ 123.)

actions taken in cyberspace," (Doc. 41, p. 8), but the case they cite involved a claim that the defendant intercepted or viewed the plaintiff's emails, and the question in that case was whether an email constitutes "chattel." *Porters Bldg. Ctrs., Inc. v. Sprint Lumber*, 2017 WL 4413288, at *10-11 (W.D. Mo. Oct. 2, 2017). There is no support for Plaintiffs' conclusory argument that what they have alleged is close to a harm recognized in common law.

In addition to relying on the common law as an analog, Plaintiffs point to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and specifically to its definition of "individually identifiable health information." This phrase is defined to include information that "relates to" an individual's health condition or health care, if the information "identifies the individual" or "there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6). Plaintiffs find this definition significant because the information collected by Google Analytics—which includes the portal user's IP address—can allegedly be used to identify the individual. The Court concludes HIPAA's definition does not aid Plaintiffs for two reasons. First, it is not clear the definition is satisfied here because (1) an IP address identifies devices, not individuals, and (2) the information associated with the IP address does not necessarily relate to an individual's health condition or health care. Second, and more importantly, Plaintiffs do not assert any HIPAA claims. "Congress is well positioned to identify intangible harms that meet minimum Article III requirements, [so] its judgment is also instructive and important," *Spokeo*, 578 U.S. at 341, but this congressional judgment is considered in the context of the statutory scheme in which it is exercised. Here, Plaintiffs invite the Court to rely on HIPAA's provisions to conclude they have standing to assert non-HIPAA causes of action—yet they cite no authority approving a theory where the congressional judgment expressed in one statutory scheme can be relied on to demonstrate an injury under a different, unrelated statute.

For these reasons, the Court concludes Plaintiffs lack standing to pursue their statutory claims.

**B. Plaintiffs' Common Law Claims**

The standing analysis utilized in Part II.A does not translate to common law claims. As explained, that analysis is used to determine if a plaintiff asserting a statutory claim has suffered a concrete injury. And, to the extent that analysis requires consideration of harms protected under common law, it makes no sense to apply it to common law claims. After all, asking if a harm is "sufficiently close" to a common law harm when discussing common law claims is not meaningful; if a plaintiff adequately states a common law claim, they have necessarily asserted a harm protected by the common law. *See*, *e.g.*, *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 890 n.9 (11th Cir. 2023); *Krupa v. TIC Int'l Corp.*, 2023 WL 143140, at *5 (S.D. Ind. Jan. 10, 2023). Thus, the Court considers whether Plaintiffs have stated a claim for unjust enrichment and intrusion into seclusion.

Under Rule 12(b)(6), the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008); *see also Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted); *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Horras v. American Capital Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

In making this evaluation, the Court is limited to a review of the Amended Complaint, its exhibits, and materials necessarily embraced by it. *E.g., Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 697 n.4 (8th Cir. 2003). The Court can also consider matters that are amenable to judicial notice. *E.g., Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015). The Court will, for the reasons explained earlier, also consider the Affidavit—only for the limited purpose of understanding the Amended Complaint's allegations—but does not consider Cerner's affidavits.

### ***1. Count VI – Unjust Enrichment/Quantum Meruit***

Under Missouri law,[10] a claim for unjust enrichment has three elements: "a benefit conferred by a plaintiff on a defendant; the defendant's appreciation of the fact of that benefit; and the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Hennessey v. Gap, Inc.*, 86 F.4th 823, 830-31 (8th Cir. 2023) (quotation omitted).[11] Plaintiffs allege the benefit they conferred on Cerner was their "valuable sensitive

[10] The parties do not conduct a choice of law analysis and primarily cite Missouri law. The Court will follow suit.

[11] The parties do not separately discuss quantum meruit; its elements are virtually the same as for unjust enrichment.

> The essential elements of quantum meruit are: (1) that the plaintiff provided the defendant with materials or services at the defendant's request or with the acquiescence of the defendant, (2) that the materials or services had reasonable value, and (3) that the defendant failed and refused to pay the reasonable value of such materials or services despite the demands of plaintiff.

*Central Parking Sys. of Missouri, LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. Ct. App. 2017). To the extent there is a difference, unjust enrichment seems to be a more appropriate fit because Plaintiffs do not allege they provided Cerner with materials or services.

medical information." (Doc. 14, ¶ 283.) But as discussed earlier Plaintiffs' subsequent filings clarify that the "medical information" Cerner collected consisted of information regarding how individuals used the portals and did not consist of test results, diagnoses, or similar medical information. Moreover, Plaintiffs allege Cerner used the data it gathered to improve the portal's operations. (*E.g.* Doc. 14, ¶ 123; Doc. 40-1, ¶ 25.)

"Even if a benefit is conferred and appreciated, if no injustice results from the retention of the benefit, then no cause of action for unjust enrichment will lie." *Roberts v. Roberts*, 580 S.W.3d 600, 605 (Mo. Ct. App. 2019) (quotation omitted). Here, Plaintiffs do not explain why their allegations demonstrate Cerner's receipt of this benefit is "unjust." As Cerner puts it, its use of tracking technology to monitor and improve the portals is akin to "a shopkeeper who noticed customers eyeing items at the back of the store and therefore moved the items out front[.]" (Doc. 21, p. 31; *see also* Doc. 40-1, ¶ 64.) The shopkeeper's acquisition and use of such information is not unjust. And significantly, Plaintiffs do not respond to this argument or otherwise address the issue. They only (1) declare they have "sufficiently plead the[ ] elements" for the claim, (2) refer the Court to four paragraphs from the Amended Complaint, and (3) list court decisions that did not dismiss unjust enrichment claims. (Doc. 25, pp. 27-28.) They do not explain how their points demonstrate a viable claim has been pleaded in *this* case. They also do not explain why Cerner's collection of this information (which may be different from the information at issue in the cases Plaintiffs cite) without compensating them is unjust.[12]

[12] The value of the cases Plaintiffs cited depends on the allegations in those cases—but the Court is not inclined to compare and contrast the pleadings in those cases with the pleadings in this one to determine how similar or different each of them are—particularly when Plaintiffs have not made the effort.

### ***2. Count VII – Intrusion into Seclusion***

The tort of invasion of privacy has several variations, *see Sofka v. Thal*, 662 S.W.2d 502, 510 (Mo. 1983) (en banc); Plaintiffs specify they are asserting the one referred to as "intrusion into seclusion." This variation has three elements: "(1) the existence of a secret and private subject matter; (2) a right in the plaintiff to keep that subject matter private; and (3) the obtaining by the defendant of information about that subject matter through unreasonable means." *Crow v. Crawford & Co.*, 259 S.W.3d 104, 120 (Mo. Ct. App. 2008) (quotation omitted). Publication of the information is not an element of this tort, *Sofka*, 662 S.W.2d at 510, which differentiates intrusion into seclusion from a different privacy-related tort (public disclosure of private facts) that does require publication. *See Balke v. Ream*, 33 S.W.3d 589, 594 (Mo. Ct. App. 2000).

Cerner focuses on the third element, which requires that it obtained the information through unreasonable means. "To meet the third element, the claimant must show that the other party unreasonably *obtained* information about the claimant's private subject matter." *St. Anthony's Med. Ctr. v. H.S.H.*, 974 S.W.2d 606, 610 (Mo. Ct. App. 1998) (emphasis in original). Allegations about what Cerner did with the information thereafter (including allegations that it conveyed the information to Google) are irrelevant when analyzing this tort. Here, Plaintiffs allege Cerner created the patient portals, then used Google Analytics to obtain information about what people did on them. And as stated earlier, they also allege Cerner did this so it could analyze use of the portals and enhance them. (*E.g.*, Doc. 14, ¶ 123.) Information gathered in the ordinary course of business is not obtained through improper means. *E.g.*, *St. Anthony's Med. Ctr.*, 974 S.W.2d at 610; *Petri v. Valarity, LLC*, 2015 WL 7253061, at *2 (E.D. Mo. Nov. 17, 2015); *see also Thomas v. Corwin*, 483 F.3d 516, 532 (8th Cir. 2007).

Plaintiffs point to their allegations that Cerner (1) "secretly deploy[ed]" Google Analytics and (2) "trespass[ed]" on their computers by using third person cookies (belonging to Google, utilized as part of Google Analytics) that they disguised as first person cookies belonging to Cerner. (Doc. 25, p. 24.)[13] But the use of Google Analytics was simply the means by which Cerner—in the ordinary course of business—collected information. To continue with the shopkeeper analogy discussed in Part II(B)(1) above, a shopkeeper using cameras or floor sensors to gather information about foot traffic or customer activities in a store has not utilized improper means. Similarly, a website designer using computer tools to track activity on the website it designed is not utilizing improper means.[14]

**C. Whether Dismissal Should be With or Without Prejudice**

The parties dispute whether, if the Court concludes dismissal is appropriate, the dismissal should be with or without prejudice. The answer is simple with respect to the statutory claims: a dismissal for lack of jurisdiction is always without prejudice. With respect to the common law claims, there is "a presumption that a dismissal under Rule 12(b)(6) is a judgment on the merits made with prejudice and such a dismissal can be rendered without prejudice if the court so specifies." *Ellis v. Nike USA, Inc.*, 158 F.4th 932, 936 (8th Cir. 2025) (cleaned up; quotation omitted) (discussing Fed. R. Civ. P. 41(b)). But the parties' real dispute is whether Plaintiffs should be permitted a chance to file a Second Amended Complaint. Here, Plaintiffs do not explain how they could amend their claims, have not filed a motion seeking leave to amend, and have not proposed a Second Amended Complaint as required by Local Rule 15.1. Under these

---

[13] Plaintiffs present additional arguments, but they all relate to the communication of information to Google—which, as stated, is not relevant for this tort.

[14] As stated earlier in Part II.A, Plaintiffs' allegation that Cerner "misrepresented" cookies as belonging to it and not Google appears to be contradicted by the Affidavit. (*See* Doc. 40-1, ¶ 18.) Regardless, given Plaintiffs' explanation as to the difference between first party and third-party cookies, it appears that cookies placed by Cerner constitute first party cookies, regardless of whether the cookies were created by Google for use by Cerner.

circumstances, the Court is within its discretion to follow the typical approach and dismiss Counts VI and VII with prejudice. *See*, *e.g.*, *Rivera v. Bank of Am., N.A.*, 993 F.3d 1046, 1051 (8th Cir. 2021); *Soueidan v. St. Louis Univ.*, 926 F.3d 1029, 1036-37 (8th Cir. 2019); *Misischia v. St. John's Mercy Health Sys.*, 457 F.3d 800, 805-06 (8th Cir. 2006).

## III. CONCLUSION

The Motion to Dismiss, (Doc. 20), is **GRANTED**. Counts I through V and VIII are dismissed without prejudice for lack of jurisdiction and Counts VI and VIII are dismissed with prejudice for failure to state a claim.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, JUDGE
UNITED STATES DISTRICT COURT

Date: April 13, 2026